[Cite as *State v. Curry*, 2018-Ohio-4771.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105203**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**LINDSEY CURRY**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-602685-A

**BEFORE:** Laster Mays, J., Stewart, P.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** November 29, 2018

-i-

**ATTORNEYS FOR APPELLANT**

Russell S. Bensing
600 IMG Building
1360 East Ninth Street
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By:     John Farley Hirschauer
          Brandon Piteo
Assistant County Prosecutors
Justice Center,    9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


ANITA LASTER MAYS, J.:

{¶1} Defendant-appellant, Lindsey Curry ("Curry"), appeals his bench trial convictions for two counts of endangering children (R.C. 2919.22(A), felonies of the third-degree), one count of tampering with evidence (R.C. 2921.12(A)(1), a third-degree felony), one count of having a weapon while under disability (R.C. 2923.13, a third-degree felony), and two counts of misdemeanor assault (R.C. 2903.13(B)).  The convictions stemmed from the alleged accidental shooting of a nine-year-old female victim ("victim 1") and a two-year-old male victim ("victim 2"), Curry's niece and nephew.[1]

---

[1]  The trial court issued a not guilty finding on Counts 5 and 6, endangering children, pursuant to R.C. 2919.22(A)(1) and on the gun specifications for Counts 1 and 2.

**{¶2}** Curry was sentenced to a 36-month term of incarceration at Lorain Correctional Institution for the two child endangering counts with up to three years of postrelease control.[2] He was also sentenced to a 60-month community control sanction ("CCS"), including a period of house monitoring, for the tampering with evidence and having a weapon while under disability counts, to commence after his term of imprisonment.

**{¶3}** We affirm.

## I.    Facts

**{¶4}** Lindniquea Curry ("L. Curry"), the sister of Curry, resided with her co-parent, Ortez Littlejohn ("Littlejohn"), and their six children including victim 1 and victim 2 at the family home.  A family friend, Alisa Thomas ("Thomas"), resided in a rear bedroom of the family home and also served as a babysitter for the children.

**{¶5}** On July 4, 2015, L. Curry returned home from work between 7:30 a.m. to 8:15 a.m. Curry, who did not reside at the home, opened the door for his sister and returned to sleep on the living room sofa.  Victim 1 and her 10-year-old sister were sleeping on the living room floor in front of the sofa.  L. Curry joined Littlejohn and the three youngest children, including victim 2, who were sleeping in the bedroom immediately adjacent to the living room.  L. Curry was falling asleep when she was startled by the sound of a single "pop."   (Tr. 52.)

**{¶6}** L. Curry and Littlejohn ran into the living room.  The room "smelled like the red popper firecrackers."  (Tr. 55.)  Victim 2 had apparently gone into the living room and was sitting a few feet away from victim 1 and was pointing to his chest.  Victim 1 was laying on the floor with a blanket pulled up to her shoulders and appeared to be "stunned."  (Tr. 261.)  "Her face was real twisted up and she was looking around."  *Id.*  Littlejohn was not aware that she was injured.  L. Curry picked up victim 2, saw that he was bleeding, and screamed for someone

---

[2]    Counts 7 and 8 merged with Counts 1 and 2 for sentencing, and the state elected to proceed on Counts 1 and 2.

to call 911. Thomas ran into the room to call 911. Curry sat up on the sofa and stated that he did not know what happened. Littlejohn stated that Curry "was sitting there" "looking like he just messed up." (Tr. 261.)

{¶7} Victim 1 said that she felt "a firecracker under" her and Curry picked her up. (Tr. 57.) Curry, L. Curry, and Littlejohn rushed the children to the hospital. L. Curry and Littlejohn testified that they did not see a gun at any time. Detective David Borden ("Det. Borden") and his partner were assigned to the hospital to investigate the shooting. They interviewed Littlejohn and L. Curry at the hospital, but Curry had returned to the house by the time of their arrival. L. Curry told police that Curry does not carry a gun, but another brother, Anthony Houston ("Houston") who she later learned was also at the house that night and who is involved with gang activity, carries a firearm. Littlejohn consented to a subsequent police search of his belongings and for gun shot residue ("GSR").

{¶8} Crime scene technician Detective James Raynard ("Det. Raynard") arrived at the scene at 9:50 a.m. An exterior examination of the residence revealed no evidence of a shooting. Various surfaces inside of the residence, including clothing and other items, were examined for bullet holes, shell casings, GSR and touch DNA. After reviewing the scene, detectives believed the gunshot came from within the house and that Curry was the only person in the living room with the victims.

{¶9} Cuyahoga County Forensic Scientist Curtiss Jones ("Jones"), supervisor of the trace evidence unit, analyzed the samples of clothing and other materials as well as seven GSR kits provided by Det. Raynard. There was no GSR on Curry's clothing. Jones also examined the GSR kits for evidence of GSR primer that forms spherical particles of antimony, barium, and lead, the three chemical elements emitted when a weapon is fired.

{¶10} The GSR analyses for L. Curry, the ten-year-old, and four-year-old siblings were inconclusive. There was no GSR indicated for victim 2.

{¶11} The GSR results for Thomas were positive:

WITNESS:    There were four particles that contained lead and barium and antimony of the hand samples of Alisa Thomas, and there were two particles that contained lead and antimony from the hand samples of Alisa Thomas.

COUNSEL:    So we have six total particles, four containing all three elements and two contain two of the three elements?

WITNESS:    Correct.

(Tr. 394.)   Jones stated that "this individual either fired a weapon there in close proximity to a firearm at the time it was discharged or came in contact with some item that had gunshot primer residue on it and there was a secondary transfer."   (Tr. 394.)

{¶12} GSR results from Curry's hands revealed "two particles that contained lead, barium, and antimony" and "five particles that contained lead and antimony."   (Tr. 394.)   Jones stated "this individual either fired a weapon there in close proximity to a firearm at the time it was discharged or they came in contact with some item that had gunshot primer residue on it and there was a secondary transfer."   *Id*.

{¶13} Jones explained that the sofa was not tested because it is impossible to determine when the GSR was placed there or how it arrived.   Jones was also unable to determine from the evidence what type of weapon was involved.

{¶14} Special agent Daniel Winterich ("Winterich") from the Ohio Bureau of Investigation ("BCI") attempted to reconstruct the shooting.   He testified that there were many possible scenarios, depending on the positioning of the victims.

**{¶15}** Medical evidence revealed that a bullet passed through victim 2's shoulder into victim 1. Dr. Charles Yowler ("Dr. Yowler"), director of pediatric trauma at MetroHealth, testified that the bullet entered victim 1 from the front of the left shoulder, traveled downward, punctured the lung, and lodged in the spine at navel level.

**{¶16}** There was no indication of powder burns on victim 1. Dr. Yowler could not tell what position victim 1 was in when the gun was fired or her proximity to the weapon at that time. He was "confident the gun was not held inches from her skin." (Tr. 587.) Paralysis from the waist down was immediate. Victim 2 recovered after spending a month in the hospital.

**{¶17}** After all testimony, the trial court found Curry guilty of the two counts of endangering children, but not guilty of the attached firearm specifications or the misdemeanor child endangering counts. Curry was also found guilty of tampering with evidence, having a weapon while under disability, and two counts of assault. The assault charges merged with the child endangering counts.

**{¶18}** Curry timely appeals.

## II.  Assignments of Error and Standard of Review

**{¶19}** Curry presents four assigned errors[3] attacking the sufficiency and manifest weight of the evidence for the convictions, including the Crim.R. 29(A) denial. Crim.R. 29(A) tests the sufficiency of the evidence. *State v. Hoskin-Hudson*, 8th Dist. Cuyahoga No. 103615, 2016-Ohio-5410, ¶ 7, citing *State v. Capp*, 8th Dist. Cuyahoga No. 102919, 2016-Ohio-295, ¶ 19.

---

[3] At the oral argument in this case, this court elected to have the parties brief the issue of the legality of the consecutive and concurrent community control sanctions term. We will address that issue later herein.

{¶20} The Ohio Supreme Court has explained that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387.

{¶21} Sufficiency asks whether, when "viewed in a light most favorable to the prosecution," "a rational trier of fact" could find that the state met its burden of production on each element of the offense with the evidence admitted at trial?[4] A manifest weight challenge asks whether, viewed from the perspective of a "thirteenth juror," it is apparent that the jury has clearly "lost its way" due to "misrepresentation or misapplication of the evidence."[5]

{¶22} Our finding that a judgment or conviction is supported by the manifest weight of the evidence is dispositive of the question of sufficiency, but our determination that evidence is sufficient to support a judgment or conviction does not preclude a finding that the judgment or conviction "is against the weight of the evidence." *Thompkins* at 387. *Cleveland v. Roche*, 8th Dist. Cuyahoga No. 96801, 2012-Ohio-806, ¶ 8, citing *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161,¶ 11, citing *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

---

[4]  *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, citing *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus,   following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[5]  *State v. Stewart*, 8th Dist. Cuyahoga No. 86411, 2006-Ohio-813, ¶ 11, quoting *Thompkins* at 387.

### III. Discussion

#### A. Endangering Children

{¶23} The first challenge, enumerated assigned errors one and two, is to the sufficiency and manifest weight of the evidence supporting the convictions for child endangering, each a third-degree felony pursuant to R.C. 2919.22(E)(2)(c) where the act results in serious physical harm.

> No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

R.C. 2919.22(A).

{¶24} The counts provide that Curry violated R.C. 2919.22(A) by:

> [B]eing a parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age, did recklessly create a substantial risk to the health and safety of [victim], by violating a duty of care, protection or support.

> Furthermore, and the violation resulted in serious physical harm to [the victim].

Curry was adjudicated "not guilty" on the one-year and three-year firearm specifications on these counts that provided that he possessed, controlled, or used a firearm in committing the child endangering acts. R.C. 2941.141(A) and 2941.145(A).

{¶25} The purpose and policy of R.C. 2919.22(A) is to protect the children by "'preventing acts of omission or neglect.'" *Cleveland Hts. v. Cohen*, 2015-Ohio-1636, 31 N.E.3d 695, ¶ 27 (8th Dist.), quoting *State v. Bennett*, 7th Dist. Mahoning No. 12 MA 223,

2013-Ohio-5524, ¶ 19, quoting *State v. Newman*, 4th Dist. Ross No. 94CA2079, 1995 Ohio App. LEXIS 3713 (Aug. 18, 1995).

**{¶26}** Proof of recklessness means that the person acted with:

"[H]eedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result, or is likely to be of a certain nature." R.C. 2901.22(C). Thus, to support a conviction for child endangering under R.C. 2919.22(A), it must be established, beyond a reasonable doubt, that [appellant] (1) recklessly (2) created a substantial risk to the health or safety of one or more of his children (3) by violating a duty of care, protection or support.

*Cohen* at ¶ 25.

**{¶27}** Curry argues that he is not in loco parentis and did not have custody and control of the children. The record demonstrates that Thomas performed the babysitting services for the family, not Curry, and that Thomas was actually babysitting the night of the incident at the time of Curry's arrival. Littlejohn and L. Curry testified that Thomas was watching the children that evening, and Littlejohn testified that he took the six-month-old to bed with him and left the bedroom door ajar when he went to bed so that he could keep an eye on the children in the living room.

**{¶28}** A person in loco parentis "'factitiously'" steps into the shoes of a parent, assumes the duties, responsibilities, maintenance, and support of the child. *In re J.B.*, 8th Dist. Cuyahoga No. 103521, 2016-Ohio-5513, ¶ 48, quoting *State v. Burgett*, 3d Dist. Marion No. 9-09-14, 2009-Ohio-5278, ¶ 23, quoting *State v. Noggle*, 67 Ohio St.3d 31, 33, 615 N.E.2d 1040 (1993), quoting *Black's Law Dictionary* 787 (6th Ed.1990).

**{¶29}** Further,

A person who stands in loco parentis to a child has assumed similar duties to that of a guardian or custodian, only not through legal proceedings. In order to meet the definition of in loco parentis, a person must not only assume a dominant parental role, but must also be relied upon by the child for support. Furthermore,

> "[t]he key factors of an in loco parentis relationship have been delineated as 'the intentional assumption of obligations incidental to the parental relationship, especially support and maintenance.'"

*Id*. at ¶ 48, quoting *Burgett* at ¶ 23.

**{¶30}** L. Curry and Littlejohn were present in the home at the time of the incident and Curry, who did not reside at the home, was asleep on the sofa. We cannot say that Curry stood in loco parentis to the children and assumed parental duties for the children's benefit. *In re J.B.*, 8th Dist. Cuyahoga No. 103521, 2016-Ohio-5513, ¶ 49.

**{¶31}** While we cannot say that Curry stood in loco parentis, we do find that Curry had custody and control of the children. "A child endangering conviction may be based upon isolated incidents or even 'a single rash decision'" where the person in custody or control "recklessly puts" "a child's health or safety at risk." *Id*., quoting *State v. James*, 12th Dist. Brown No. CA2000-03-005, 2000 Ohio App. LEXIS 5905, *6-7 (Dec. 18, 2000). *See State v. Huffman*, 8th Dist. Cuyahoga No. 93000, 2010-Ohio-5116, ¶ 30 (conviction for endangering children affirmed where defendant's five-year-old nephew was in the backseat of the car that defendant was driving when he was arrested for a drug-related offense).

**{¶32}** Curry explained during his first police interview that Thomas served as the primary babysitter and that he sometimes served as a "second babysitter. I help [Thomas]." He also said that the children viewed him as an authority figure and that he helped out with the children frequently. In the early morning hours on the date in question, the children were in the living room with Curry. They had all watched television for a while before falling asleep. When the shooting occurred, Curry was the only adult in the room with the children. The evidence revealed that Curry had GSR on his hands.

**{¶33}** We find that the state established that the appellant had custody and control over the children and put the children's safety at substantial risk. *State v. Masterson*, 8th Dist. Cuyahoga No. 88102, 2007-Ohio-1145, ¶ 23.

**{¶34}** Viewed in a light most favorable to the state, we find that the evidence is sufficient to support the state's burden of production for the child endangering conviction. We further determine that, upon review of the entire record, weighing the evidence and all reasonable inferences, the trier of fact's finding on this issue is supported by the manifest weight of the evidence. *See State v. White*, 8th Dist. Cuyahoga No. 90839, 2008-Ohio-6152, ¶ 12.

### B. Tampering With Evidence, Weapon While Under Disability, and Assault

**{¶35}** The third and fourth assigned errors challenge the sufficiency and manifest weight of the evidence on the charges of tampering with evidence, having a weapon while under disability, and assault.

### 1. Having a Weapon While Under Disability

**{¶36}** R.C. 2929.13(A)(2), having a weapon while under disability, a third-degree felony, provides:

> (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> * * *
>
> > (2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

**{¶37}** Curry's GSR test was positive, indicating that he had fired a gun, was in close proximity to a gun when fired or that he handled a gun that had been fired resulting in a

secondary transfer. Thomas, who also tested positive for GSR,[6] remained at the house with the children while Curry, L. Curry and Littlejohn took victim 1 and victim 2 to the hospital. The state opines that Curry left the hospital to return to the house and tamper with the weapon.

{¶38} The not guilty finding on the firearm specifications for Counts 1 and 2 is not inconsistent with the finding of guilt on the weapon's charge. "[T]he offense of having a weapon while under disability and the firearm specification charges involve different elements and the conviction of one does not preclude the conviction of the other." *State v. Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, 825 N.E.2d 1158, ¶ 41 (8th Dist.).

{¶39} Based on the strength of the GSR evidence, coupled with Curry's denial of firing, observing, or handling a gun, we cannot say that the evidence is not sufficient to support Curry's conviction of having a weapon while under disability or that it is against the manifest weight of the evidence.

### 2. Tampering with Evidence

{¶40} R.C. 2921.13(A)(1), a third-degree felony, provides

(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation.

{¶41} Once the shooting occurred, there could be no question that an official investigation was likely to be instituted. The facts suggest that the gun was removed, concealed, or destroyed. The gun was never recovered, yet GSR was found on Curry's hands and the state offers that Curry was in the room when the incident occurred. Based on the evidence available

---

[6] While Thomas's results were at least equally indicative, Thomas was not indicted or called as a witness. The 911 call initiated by Thomas is not part of the record, nor is the statement that Thomas reportedly gave to police.

in the record, and particularly the GSR test results, we cannot say that the evidence is not sufficient to support the conviction for tampering with evidence when viewed in a light most favorable to the state or that the conviction is against the manifest weight of the evidence.

### 3. Assault

{¶42} Finally, Curry challenges the convictions for the two misdemeanor assault counts under R.C. 2903.13(B), which states that "no person shall recklessly cause serious physical harm to another." Curry asserts that the evidence is primarily circumstantial.

{¶43} Circumstantial "'evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned.'" *State v. Durham*, 2016-Ohio-691, 60 N.E.3d 552, ¶ 160 (8th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991).

{¶44} Once again, based on the GSR evidence and Curry's presence in the room, we cannot say based on the proffered evidence that Curry did not recklessly cause serious physical harm to victim 1 and victim 2. The evidence is sufficient to support the conviction for assault when viewed in a light most favorable to the state and the assault conviction is not against the manifest weight of the evidence.

{¶45} The third and fourth assigned errors are without merit.

### C. Sentencing

{¶46} Appellant was sentenced to a 36-month term of imprisonment to run concurrently on Counts 1 and 2 with postrelease control for up to 36 months pursuant to R.C. 2967.28. Upon appellant's release from prison, "[a] capias shall be issued for the defendant to be returned to the Cuyahoga County Jail to commence community control."

> As to Counts 3 and 4, concurrently: the court finds that a community control/probation sanction will adequately protect the public and will not demean the seriousness of the offense. It is therefore ordered that the defendant is

sentenced to 60 month(s) of community control/probation on each count, under supervision of the adult probation department with the following conditions: defendant to abide by the rules and regulations of the probation department. Court orders defendant to be supervised by: intensive special probation supervision unit [and] the defendant must participate in the home detention GPS monitoring unit for 180 days.

Journal entry No. 96363092 (Nov. 3, 2016). The section details the terms and conditions of the community control sanction, including penalties for violating.

{¶47} We sua sponte required the parties to brief whether the concurrent sentences in this case for imprisonment on two child endangering counts, followed by community control sanctions with electronic monitoring for the tampering with evidence, and having a weapon while under disability counts are valid pursuant to our en banc decision in *State v. Anderson*, 2016-Ohio-7044, 62 N.E.3d 229 (8th Dist.).

{¶48} Anderson received a three-year aggregate sentence of imprisonment (consecutive terms of one year on a firearm specification and two years for robbery) to be served prior to the consecutive term of "two years of community control including an indefinite term of confinement in a community-based correctional facility" for the fifth-degree felony of identity fraud. *Id*. at ¶ 9. A mandatory three-year period of postrelease control was also imposed.

{¶49} We considered whether the legislature authorized a trial court "to impose a term of residential or nonresidential community control sanctions on one felony count, to be served consecutive" to a prison term imposed on a separate felony count. *Id*. at ¶ 5. *See State v. Anderson*, 143 Ohio St.3d 173, 2015-Ohio-2089, 35 N.E.3d 512 (a trial judge may only impose a sentence that is authorized by statute.)

{¶50} A residential community control sanction is a term of imprisonment under R.C. 2929.41(A), governing multiple sentences, "that must be served concurrently due to the lack of

an exception" allowing consecutive sentencing. *Id.* at ¶ 15-16, citing *State v. Barnhouse*, 102 Ohio St.3d 221, 2004-Ohio-2492, 808 N.E.2d 874, at ¶ 12. "Nonresidential sanctions are not sentences of imprisonment." *Id.* As a result, the analysis turns on whether legislative authority exists "to impose nonresidential sanctions consecutive to a prison term imposed on a separate count." *Id.*

**{¶51}** In a seven-to-five decision, we determined that "there is no statutory authority" under R.C. 2929.41(A) that allows for "the imposition of community control sanctions to be served consecutive to, or following the completion of, a prison or jail term or other sentence of imprisonment." *Id*. at ¶ 31. We vacated the community control sanction and remanded the case to the trial court for resentencing solely on that count. *Id.* at ¶ 32.

**{¶52}** The state presents an argument that was, at the time of briefing, pending a decision by the Ohio Supreme Court in *State v. Paige*, 8th Dist. Cuyahoga No. 104109, 2016-Ohio-7615, *discretionary appeal allowed*, 150 Ohio St.3d 1407, 2017-Ohio-6964, 78 N.E.3d 908. The Ohio Supreme Court recently rendered its decision. *State v. Paige*, Slip Opinion No. 2018-Ohio-813.

**{¶53}** The defendant in *Paige* entered a guilty plea to abduction, sexual battery, and domestic violation. The abduction and sexual battery counts merged, and Paige was sentenced on the sexual battery count to a 42-month term of imprisonment and mandatory postrelease control for five years. *Id*. at ¶ 2-3.

**{¶54}** Paige was sentenced to five years of community control supervision, with listed conditions, for the domestic violence count. After completing the prison term, Paige was to be returned to "county jail for assessment and transferred to a CBCF" to complete anger management and was not allowed to contact the victim during the community control term.

Paige was also sentenced to three years of mandatory postrelease control and classified as a Tier III sex offender. *Id*. at ¶ 3. This court vacated the domestic violence sentence holding that it constituted a split sentence. *Id*. at ¶ 7, citing *Paige*, 2016-Ohio-7615, at ¶ 10.

**{¶55}** The Ohio Supreme Court determined that Paige's sentence was not a split sentence. *Id*. at ¶ 8.

> [T]he mere fact that the sentences on each offense were to run concurrently does not mean that the community control sentence imposed on the domestic-violence count included a prison term. The prison term was imposed on the sexual-battery count, and a period of community control supervision was imposed separately on the domestic-violence count.

*Id*. at ¶ 9. "[N]othing in the sentencing statutes requires the duration of a community control sanction to match that of a concurrent prison term." *Id*. at ¶ 10.

**{¶56}** The court agreed with this court's finding in *Anderson*, 2016-Ohio-7044, 62 N.E.3d 229 (8th Dist.), that the CBCF requirement constitutes an impermissible term of imprisonment:

> A confinement term in a CBCF is a permissible community-residential sanction for certain felony offenders pursuant to R.C. 2929.16(A)(1). But here, none of the statutory exceptions in R.C. 2929.41(A) apply to permit the CBCF term to run consecutively to the prison term imposed on the sexual-battery count. *State v. Anderson*, 2016-Ohio-7044, 62 N.E.3d 229, ¶ 16 (8th Dist.); *see also State v. Barnhouse*, 102 Ohio St.3d 221, 2004-Ohio-2492, 808 N.E.2d 874 (concluding that because the General Assembly expressly provided statutory exceptions to the general rule that sentences of imprisonment must be run concurrently and because jail sentences did not qualify as an exception under R.C. 2929.41(A), jail sentences may not be imposed consecutively). Accordingly, the trial court had no statutory authority to order, as part of the community control sanction, that Paige be placed in a CBCF after his completion of the separate prison term. Judges must impose only those sentences provided for by statute. *Anderson*, 143 Ohio St.3d 173, 2015-Ohio-2089, 35 N.E.3d 512, at ¶ 12. Thus, the trial court's imposition of a CBCF term as a community control sanction, to be served consecutively to a prison term imposed on a separate offense, was improper.

*Id*. at ¶ 13. The court determined that the proper remedy was simply to vacate the CBCF portion of the community control term. *Id*. at ¶ 14.

**{¶57}** In the instant case, upon Curry's release from imprisonment for Counts 1 and 2, he was ordered to serve on Counts 3 and 4 a term of "60 month(s) of community control/probation" "to be supervised by: intensive special probation supervision unit [and] the defendant must participate in the home detention GPS monitoring unit for 180 days."

**{¶58}** House arrest is covered by R.C. 2929.01(P) under the definitions section for penalties and sentencing.

> "House arrest" means a period of confinement of an offender that is in the offender's home or in other premises specified by the sentencing court or by the parole board pursuant to section 2967.28 [governing periods of postrelease control for certain offenders] of the Revised Code and during which all of the following apply:
>
> (1) The offender is required to remain in the offender's home or other specified premises for the specified period of confinement, except for periods of time during which the offender is at the offender's place of employment or at other premises as authorized by the sentencing court or by the parole board.
>
> (2) The offender is required to report periodically to a person designated by the court or parole board.
>
> (3) The offender is subject to any other restrictions and requirements that may be imposed by the sentencing court or by the parole board.

R.C. 2929.01(P).

**{¶59}** No presumption for probation or prison applied to these third- degree felony convictions. The term of imprisonment applied to the first two counts. The community control sanctions were imposed to run concurrently on the remaining counts. Therefore, the split sentence doctrine is not implicated in this case. *See Paige,* Slip Opinion No. 2018-Ohio-813.

**{¶60}** As in *Paige*, none of the exceptions set forth in R.C. 2929.41(A) apply in this case to allow a term of confinement subsequent to a prison term that has been imposed in the same case. *Id.* at ¶ 13. We recently applied *Paige* in *State v. Cole*, 8th Dist. Cuyahoga No. 106724, 2018-Ohio-2224, ¶ 15, where we approved the imposition of community control sanctions upon completion of a prison term on other counts, but vacated the CBCF confinement portion of the sanction.[7]

**{¶61}** If the house arrest with GPS monitoring in this case constitutes a term of confinement, we must find that portion of the sentence is not lawfully imposed. R.C. 2929.15 governs community control sanctions for certain felonies:

> If in sentencing an offender for a felony the court is not required to impose a prison term, a mandatory prison term, or a term of life imprisonment upon the offender, the court may directly impose a sentence that consists of one or more community control sanctions authorized pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code.

R.C. 2929.15(A)(1).

**{¶62}** "[A] term of house arrest with electronic monitoring imposed under R.C. 2929.17 is a [nonresidential] community control sanction." 2009 Ohio Atty.Gen.Ops No. 28.

**{¶63}** Guided by *Paige*, we look to R.C. 1.05(A) to determine whether house arrest with electronic monitoring falls within the definition of imprisonment, constituting confinement in an institution.

> (A) As used in the Revised Code, unless the context otherwise requires, "imprisoned" or "imprisonment" means being imprisoned under a sentence imposed for an offense or serving a term of imprisonment, prison term, jail term, term of local incarceration, or other term under a sentence imposed for an offense in an institution under the control of the department of rehabilitation and

---

[7] The community control sanctions included abiding by probation department rules and regulations, "supervision by Group E," weekly reporting, payment of a monthly supervision fee, twice-weekly drug testing, and no contact with the victim. *Id.* at ¶ 15.

correction, a county, multicounty, municipal, municipal-county, or multicounty-municipal jail or workhouse, a minimum security jail, a community-based correctional facility, or another facility described or referred to in section 2929.34 of the Revised Code for the type of criminal offense and under the circumstances specified or referred to in that section.

(B) As used in division (A) of this section, "community-based correctional facility" has the same meaning as in section 2929.01 of the Revised Code.

R.C. 1.05(A).[8]

{¶64} The imposition of house arrest with electronic monitoring does not constitute a term of imprisonment under the statute. We find that the sentence in this case is lawfully imposed.

## IV. Conclusion

{¶65} We affirm the trial court's judgment in this case.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MELODY J. STEWART, P.J., CONCURS;
MARY J. BOYLE, J., CONCURS IN JUDGMENT ONLY WITH SEPARATE OPINION

MARY J. BOYLE, J., CONCURRING IN JUDGMENT ONLY:

---

[8] R.C. 2929.34 lists the type of institutions where the term of imprisonment can be served and house arrest is not listed.

**{¶66}** While I agree with the majority's ultimate conclusion and its analysis and finding that there was sufficient evidence that Curry had custody and control of the children, I respectfully disagree with its conclusion that there was insufficient evidence of whether Curry was acting in loco parentis under R.C. 2919.22(A).

**{¶67}** The majority finds that Curry was not in loco parentis to L. Curry and O. Littlejohn because "Thomas performed the babysitting services for the family, not Curry," the children's parents were home at the time of the incident, and Curry did not reside at the home. In reaching its conclusion, the majority cites to *In re J.B.*, 8th Dist. Cuyahoga No. 103521, 2016-Ohio-5513. In that case, we found that the juvenile's aunt lacked in loco parentis standing because there was "no evidence that [she] exercised significant control over or assumed parental duties for the benefit of the children." *Id.* at ¶ 49.

**{¶68}** This case is distinguishable from *J.B.*, however, because the record in this case contains sufficient evidence to show that Curry was acting in loco parentis to the children-victims. During his taped interview with detectives included in the record and labeled as exhibit No. 196, Curry made multiple statements establishing that he was acting in loco parentis to the children-victims.

**{¶69}** Around the 5:00 mark of the interview, the detectives and Curry discussed what occurred during the early morning hours of July 4:

Detective:     So [the 6 month old] was acting up?

Curry:  Yeah.

Detective:     So you looked after him?

Curry:  [Yes.]

Detective:     And this was about what time?

Curry: I didn't look at the clock. It was wee hours of the morning. Before [my sister] came — I thought she was at home originally.

{¶70} Around the 10:00 mark of the interview, the following exchange occurred:

Curry: This shows you how much I am of an uncle.  My sister — because we have bad raccoons over there * * *.

Detective:     Over at your sister's house?

Curry: Yeah. So she just had bought three things of ammonia the other day. I put these up yesterday because I notice that you got these kids that don't like to listen, babysitting situation. I've been babysitting kids since I was little[.] I'm 30 years old.  Three things of ammonia. Two things of bleach. First off, that's a hazard right there.  And then have a two-year old, [* * *] he's bad. He do whatever, you know what I'm saying?  And I have to be there because he listens to me and I don't put my hands on the kids.  I talk to them and they do what I say.  Uncle stuff.

* * *

Curry: [My nieces and nephews] get into everything.  Ain't no leaving nothing out for them.  If you don't be that right person to tell them — like [Alisa], they don't listen to her.  * * * That's why I'm there to back-up babysit.

Detective:     Why is Alisa there?

Curry: To babysit.

Detective:     But you said you're basically the babysitter, right?

Curry: No. I said I'm second babysitter.   I help her.

{¶71} Curry also explained, around the 16:30 mark through the 20:00 mark of the video, that he went to his sister's house on July 3, the day before the shooting, to take his medicine, left, and spent the afternoon at a friend's house, and then returned later that night around 1:00 a.m.

{¶72} Beginning around the 20:30 mark, the detectives and Curry discussed what occurred when he returned to his sister's house on the morning of July 4:

Detective: At what point did you see [Alisa's] face?

Curry: Some time around when I came in.

Detective: Okay. So you see Alisa's face. Was she up[?]

Curry: She was up. * * *

Detective: [Alisa] was wide awake?

Curry: Yeah.

Detective: Okay. * * * What do you do?

Curry: I sit down on the couch. They were watching TV for a minute so I was just watching TV with them.

Detective: When you say with them, who are you referring to?

Curry: [Alisa] and the kids. * * *

Detective: So you guys are sitting in the living room. The kids are asleep, right?

Curry: No. The kids weren't asleep.

Detective: At that time they weren't?

Curry: No. They weren't asleep. * * *

Detective: The kids are awake. * * * So at what point does everyone separate or fall asleep?

Curry: I want to say close to 4 o'clock because I didn't know what time their mom came in to be honest though. And I mean if [they're] not acting bad, they got their [inaudible] made, I'm not [going to] — It's the summer time. Regardless of [whether] they got to get ready to go back to school in a little bit or not. I'm still going to let them enjoy their summer, know what I'm saying? [I'll] let them stay up and watch TV.

**{¶73}** Around the 25:30 mark of the video, Curry and the detectives discussed what happened during the hours right before the incident occurred:

Curry: I was up for [a] minute.  That's when the baby started crying.  I had to get him. * * * He was laying on the couch. * * *

Detective: Alright so [the baby] sort of is disturbed or wakes up a little bit —

Curry: [Yes.]

Detective: — and you attend to him? Do you feed him?

Curry: I think I was rocking him.

Detective: Okay.

Curry: I did feed him though.

Detective: Where's [Alisa] at this point?

Curry: She [is] in the room.

Detective: She went back to the room?

Curry: She don't like getting up and dealing with him.  The episode in the wee hours of the morning.

**{¶74}** Around the 37:00 mark of the interview, the detectives asked Curry who else was in his sister's house on the morning of July 4:

Detective: [Was] anybody [else] upstairs?

Curry: No.

Detective: How do you know that?

Curry: Because everybody was downstairs.

Detective: Did you ever go upstairs?

Curry: No I didn't go up there because that's not my home.

Detective: But you're there often enough to be able to tell[?] * * *

Curry: Yeah.

Detective: [W]ho's * * * I mean, you go to bed there, when you fall asleep, you should know who's in the house with you, right?

Curry: Yeah. * * *

Detective: Because your sister told us that you help out with the kids often.

Curry: I do.

Detective: She told us that.

Curry: [Inaudible.] They love me so I ain't got no choice but to * * *

Detective: Because you're their uncle.

Curry: [t]hey want me back, so, I mean, it's like * * * It's hard because I'm not in my kids' [lives]. I take that out and it's * * * It helps me as a man to cope with the fact that I'm not seeing my kids on an every-day basis. * * * I'm cool with my nieces and nephews.

{¶75} Additionally, around the 34:30 mark interview, Curry explained that he was the only person, besides his sister, that had a key to his sister's house. Finally, during his follow-up interview with detectives included in the record and labeled as exhibit No. 197, Curry again explained that he had a key to his sister's house and that he looks after his sister's children.

{¶76} Contrary to the majority's finding, I believe Curry's statements during those interviews establish that he was acting as a babysitter, exercised significant control, and assumed parental duties for the children's benefit. Courts have found babysitters to qualify as acting in loco parentis. *See State v. Amerson*, 8th Dist. Cuyahoga No. 78235, 2001 Ohio App. LEXIS 3015, 5 (July 5, 2001) ("There is no question that defendant, as a babysitter, was acting in loco parentis."). Simply because Curry was the "second babysitter" does not change the fact that he was still babysitting the children at the time of the incident. Additionally, he stated that he had a

key to his sister's house and would stay there and that he often cared for and watched over the children even when he was not technically babysitting. As a result, I would find that there is sufficient evidence to support that Curry was acting in loco parentis under R.C. 2919.22(A).