[Cite as *State v. Primous*, 2020-Ohio-912.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108341 |
| v. | : | |
| NATHANIEL PRIMOUS, IV, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED IN PART
**RELEASED AND JOURNALIZED:** March 12, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-633189-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Shannon Musson, Assistant Prosecuting
Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

KATHLEEN ANN KEOUGH, P.J.:

{¶ 1} Defendant-appellant, Nathaniel Primous, IV, appeals his convictions following a bench trial. For the reasons that follow, we affirm in part, and reverse in part.

{¶ 2} In September 2018, Primous was named in a nine-count indictment charging him with one count each of aggravated burglary (Count 1), felonious assault (Count 2), domestic violence (Count 3), aggravated menacing (Count 4), telecommunications harassment (Count 9), and four counts of endangering children (Counts 5-8). Counts 1 and 2 also carried one- and three-year firearm specifications. The case proceeded to trial where the following evidence was presented.

{¶ 3} On September 28, 2018, the victim was sitting in her living room at her Dove Avenue address when she heard a "booming" noise. Thinking it came from her four children, who were playing upstairs, she yelled up to them. She walked toward the kitchen and heard the sound of glass breaking. As the victim ran up the stairs to her children, she heard the second windowpane of glass break. She ran into the bedroom where her children were and attempted to barricade the door with furniture. However, the door was pushed open by Primous, her estranged husband. He stood in front of the door, pointed a handgun at the victim, and asked her about the presence of another man. He then struck the victim with the gun on the side of head causing injury to her eye area. The victim stated that Primous continued to point the gun at her, so she dropped to her knees and apologized because she did not want Primous to hurt her children. When she looked up, Primous had left the room. After Primous left, the victim barricaded the door and called the police. The 911 recording was played for the court. The victim admitted that she did not identify Primous as her assailant to the dispatcher or tell them that he had a gun.

**{¶ 4}** When the police arrived, the victim told them that Primous broke into her home, and threatened and assaulted her with a gun. The victim testified that although the injury to her eye was painful, she did not seek medical attention. A photo of her injury was submitted to the court.

**{¶ 5}** According to the victim, the police were supposed to wait outside for her and her children to pack up their belongings; however, when the victim looked outside, the police were gone. The victim then heard gun shots and discovered that the shots were directed at her home. She stated that although she called the police, she was fearful and left the residence with her children before the police arrived.

**{¶ 6}** The victim identified photographs that she took two weeks prior to trail of blood found on the walls inside her home. According to the victim, the blood was from when Primous broke her window to gain entrance into her house.

**{¶ 7}** The victim also testified about text messages she subsequently received from Primous that night from 10:16 p.m. until 10:27 p.m. She identified a photograph of the "screenshot" displaying the text messages as an accurate reflection of the text messages she received. She identified that the messages were sent by "N," who, according to the victim, was Primous. The victim explained that although she has Primous's name saved in her phone, only the first letter of his name appears on the text messages. In the messages, Primous threatened to kill "him" and that no one was going to "touch you." According to the victim, Primous thought a male was in her house, which was why he believed she did not answer her telephone earlier that evening.

**{¶ 8}** The victim testified that she and Primous were happily married for two years, but separated in early January 2017; they have no children together. Although she filed for divorce after the separation, she withdrew her petition because they were attempting to reconcile. Nevertheless, they again separated in 2018 approximately five months prior to the assault. According to the victim, Primous did not live with her and her children, he surrendered his keys when he moved out, and his name was removed from the lease.

**{¶ 9}** Even though the victim stated that all four of her children were present during the assault, they were not interviewed by police. However, two of the victim's children testified at trial. Her older son, age 10, testified that he and his siblings were upstairs watching television when he heard a "loud and bumpy" noise from downstairs. He said their mother ran into the room and attempted to push the television in front of the door but Primous, who he identified as his "step-dad," came into the room and pointed a gun at the victim. He described the gun as orange and black. According to the witness, Primous asked about another man and then hit the victim in the head.

**{¶ 10}** The victim's second oldest child, age 8, also testified about the incident. He described the gun that Primous had as "gray and black." According to the witness, he knew Primous because "he sometimes comes over to [their] house," but was unsure if he and his mother were in a relationship or even friends.

**{¶ 11}** Officer Victoria Przybylski testified that she responded to a call on Dove Avenue for a burglary in progress. Upon arrival, she learned from a neighbor

that he had heard a couple of big booms and some glass breaking; the neighbor was not identified or called as a witness. Officer Przybylski approached the home, and observed the front door was ajar and glass on the floor from the front window. According to Officer Przybylski, the victim came down the stairs and told her that Primous broke into her home and assaulted her with a gun. Officer Przybylski interviewed the victim, but did not interview the children because she was advised by the victim that the children did not witness the incident. She stated that she observed and photographed the cut and swelling around the victim's eye. According to Officer Przybylski, the victim was "terrified, shaking, crying, and upset."

{¶ 12} Officer Przybylski testified that she was waiting for the victim to leave the residence when she received a call for a male at the Cleveland Clinic with a gunshot wound. Upon speaking with the reporting officers, she learned the male was identified as Primous. Officer Przybylski stated that she left the victim's residence to speak with Primous at the hospital. Once there, she observed cuts on Primous's hand, but Primous denied that he was at the victim's home or that he had recently seen her. Despite Primous telling Officer Przybylski that he was shot, she later learned from the treating physician that Primous's wounds were consistent with cuts, and not a gunshot. Based on this information, Primous was arrested.

{¶ 13} Dr. Damon Kralovic, a Cleveland Clinic medical physician, testified that he responded to the emergency department for a male, identified as Primous, with a gunshot wound. However, upon examination, he ascertained the injury was

to Primous's right elbow. Dr. Kralovic described the injuries as a "laceration" and "abrasion," and not a puncture wound.

{¶ 14} Detective John Freehoffer testified that he received the assignment the following day and interviewed the victim. Detective Freehoffer identified the photographs that he took of the exterior of the home, but admitted that he did not take any photographs inside the home because he could not gain access into the home. He admitted that he did not interview the victim's children because he had no further contact with the victim except for emailed photographs the victim took of the blood that was inside the home and the bullet fragment the victim later provided.

{¶ 15} Primous testified in his defense. He stated that he had been drinking with friends prior to going to the victim's house. According to Primous, he entered through the unlocked front door and found the victim sitting on the couch. He stated that after using the bathroom upstairs he and the victim went outside on the front porch to drink and smoke. While on the porch, they began to argue about a man she was talking to and the children Primous fathered with other women during his and the victim's marriage. Primous testified that out of anger, he "mooshed" the victim in the face, causing her injuries; he denied possessing or using a gun. He further admitted that he broke the window. When the victim ran inside stating she was calling the police, Primous ran off and went to the hospital for the injury he sustained to his elbow from breaking the window.

{¶ 16} Primous testified that he lived at the Dove address, identifying an overdue utility bill that was in his name. However, he admitted that he told the

police when he was arrested that evening that he lived at a different address — the address where he "receives his mail." Even though he initially testified that he paid the November 2018 utility bill for the Dove Avenue address, he later stated he did not pay October or November's bill because he was incarcerated. Primous further admitted that he lied to the physicians at the hospital about getting shot. He also admitted to making calls from jail to the victim begging her not to press charges. Finally, he denied that he sent the threatening text messages, but admitted he argued with the victim about another male.

{¶ 17} At the close of all evidence, the trial court found Primous guilty of all counts. The court found that counts 1, 2, and 3 were allied offenses that merged for sentencing, and the state elected that Primous be sentenced on Count 1, aggravated burglary. The court imposed a three-year sentence on Count 1, consecutive with the three-year firearm specification. The court ordered Primous to serve concurrent six-month terms on each of Counts 4 through 9, and also ordered that those sentences be served concurrently with Count 1, for a total prison sentence of six years.

{¶ 18} Primous now appeals, raising four assignments of error, which will be addressed out of order.

## A. Text Message Authentication

{¶ 19} In his third assignment of error, Primous contends that the trial court erred by admitting, without proper authentication, state's exhibit No. 4, a printout of the text messages from the victim's phone.

{¶ 20} Evidentiary rulings made at trial rest within the sound discretion of the trial court. *State v. Graham*, 58 Ohio St.2d 350, 390 N.E.2d 805 (1979). "[T]he threshold standard for authenticating evidence pursuant to Evid.R. 901(A) is low, and 'does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be.'" *State v. Inkton*, 2016-Ohio-693, 60 N.E.3d 616, ¶ 73 (8th Dist.), quoting *State v. Easter*, 75 Ohio App.3d 22, 25, 598 N.E.2d 845 (4th Dist.1991). Pursuant to Evid.R. 901(B)(1), the authentication requirement can be satisfied by the "[t]estimony of a witness with knowledge * * * that a matter is what it is claimed to be."

{¶ 21} "[I]n most cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the messages." *State v. Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, 967 N.E.2d 233, ¶ 75 (8th Dist.).

{¶ 22} In this case, the text messages were authenticated by the victim. She testified that she received the messages from Primous after he broke into her home and assaulted her. She identified that although Primous's actual name is stored in her cell phone, when a text message is sent only the first initial of his name appears. Accordingly, under the low-threshold standard, the victim had personal knowledge of the content of the text messages; thus, they were properly authenticated by the victim's testimony.

**{¶ 23}** Accordingly, Primous's third assignment of error is overruled.

## B. Sufficiency of the Evidence

**{¶ 24}** A Crim.R. 29 motion challenges the sufficiency of the evidence. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-829, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 25}** In this case, Primous was found guilty of all charges — aggravated burglary, with both one- and three-year firearm specifications, felonious assault, with one- and three-year firearm specifications, domestic violence, aggravated menacing, telecommunications harassment, and four counts of child endangering. He contends in his first assignment of error that the trial court erred when it denied his Crim.R. 29 motion for acquittal because the state failed to present sufficient evidence to support his convictions.

{¶ 26} Primous was convicted of aggravated burglary. Pertinent to this appeal, aggravated burglary is defined as trespassing by force in an occupied structure when a person other than an accomplice is present with the intent to commit a criminal offense inside the structure, and the offender inflicts, attempts, or threatens to inflict physical harm on another. R.C. 2911.11(A)(1).

{¶ 27} Primous contends that the trespass element of his aggravated burglary conviction is not supported by sufficient evidence because he was married to the victim, his name was on the lease, and a utility bill was still in his name. He also contends that he did not break the window to gain access into the home; rather, he claims he entered through an unlocked door, thus defeating the element of force. We disagree.

{¶ 28} Although Primous and the victim were married, "[a] spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling." *State v. Lilly*, 87 Ohio St.3d 97, 717 N.E.2d 322 (1999), paragraph one of the syllabus. In this case, the evidence was sufficient to demonstrate that the victim exercised custody and control of the Dove Avenue residence. The victim testified that Primous had not lived at the Dove Avenue residence for the past five months, when he surrendered his keys to the residence and his name was removed from the lease. And, according to the victim, Primous had not paid any of the utility bills despite them being his name. Accordingly, sufficient evidence of the trespass element was presented.

{¶ 29} Additionally, even if we were to believe that Primous did not break the window to gain access into the victim's home, his admitted conduct of entering through an unlocked door would still be sufficient to prove the force element of aggravated burglary. "Ohio law has long held that the force element for an aggravated burglary charge is established through the opening of a closed but unlocked door." *State v. Johnson*, 8th Dist. Cuyahoga No. 97698, 2012-Ohio-3812; ¶ 16, citing *State v. Lane*, 50 Ohio App.2d 41, 46, 361 N.E.2d 535 (10th Dist.1976). Accordingly, sufficient evidence was presented to support the force element and his overall conviction of aggravated burglary.

{¶ 30} Primous contends that despite the trial court finding the offenses of aggravated burglary, felonious assault, and domestic violence were allied and merged for sentencing, and the state electing to sentence Primous for aggravated burglary, this court should review the finding of guilt for felonious assault and domestic violence under a sufficiency analysis as well. We disagree because when counts in an indictment are allied offenses and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, this court need not consider the sufficiency of the evidence on the merged counts because any error would be harmless. *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14.

{¶ 31} Even if we addressed the findings of guilt for felonious assault and domestic violence, sufficient evidence was presented because Primous admitted, at the very least, to "mooshing" the victim in the face and causing the injury depicted

in the photograph. Moreover, under a sufficiency standard the evidence is viewed in the light most favorable to the state; accordingly, the victim and her children's testimony that Primous pointed a gun at the victim and hit her in the face with the gun would be sufficient to support the finding of guilt for felonious assault and also his convictions of both the one- and three-year the firearm specifications.

{¶ 32} Primous also contends that his convictions for aggravated menacing and telecommunications harassment were not supported by sufficient evidence because the text messages the state used to prove the offenses were not authenticated.

{¶ 33} R.C. 2903.21(A) provides that no person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person. Telecommunications harassment pursuant to R.C. 2917.21(A)(3), prohibits a person from "knowingly mak[ing] or caus[ing] to be made a telecommunication * * * to another, if the caller * * * during the telecommunication, [commits the offense of aggravated menacing]." As previously discussed, the text messages were properly authenticated by the victim. Accordingly, Primous's challenge to these offenses on appeal is without merit.

{¶ 34} Moreover, the state did not need the text messages to prove the aggravated menacing charge because Primous's conduct of breaking into the victim's home and pointing a gun at her caused the victim to believe that he would cause or attempt to cause her serious physical harm. *State v. Goodwin*, 10th Dist. Franklin No. 05AP-267, 2006-Ohio-66, ¶ 25-26 (merely displaying a weapon

supports a conviction for aggravated menacing where the victim believed the appellant would cause serious physical harm). In fact, the victim testified that she was scared and terrified for her and her children's safety. Accordingly, sufficient evidence was presented supporting Primous's conviction for aggravated menacing.

{¶ 35} Primous was also charged with four counts of child endangering, in violation of R.C. 2919.22(A), which provides that

> No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

{¶ 36} Primous contends on appeal that his convictions are not supported by sufficient evidence because (1) he did not threaten the children, and (2) he is not the children's parent, guardian, custodian, person having custody or control, or person in loco parentis of the children. The state maintains that Primous's conduct of entering the bedroom where the children were located and threatening their mother with a gun created a substantial risk to the safety of the victim's children. We agree. However, we disagree with the state's argument that Primous owed a duty of care, protection, or support to the children because (1) he was the children's stepfather, and (2) he was in control of the children.

{¶ 37} In order to be convicted of child endangering pursuant to R.C. 2919.22(A), the state must prove that the person who creates "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support"

is a person "who is the parent, guardian, custodian, person having custody or control, or person in loco parentis" of the child.[1]

{¶ 38} The state first contends that Primous's legal status as the children's stepfather places him a position to provide care, protection, and support to the child. In support, the state cites to *State v. Craig*, 4th Dist. Gallia No. 01CA8, 2002-Ohio-1433, ¶ 46, where the court simply stated, "[a]ppellant is [child victim's] stepfather." However, a "stepparent" is not an identified relationship in R.C. 2919.22(A) that automatically owes a duty of care. Rather, the identified relationships are "parents, guardians, custodians, persons having custody or control, or person in loco parentis." This is not to say that "stepparents" cannot be included as one of these classifications, but the legal status of "stepparent," alone, does not subject an individual to a criminal offense under R.C. 2919.22. The General Assembly could have included stepparent as an identified class, but has chosen not to do so. *Compare* R.C. 2907.03(A)(5), sexual battery, "offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person"; R.C. 2919.25(F), domestic violence, defining "family

---

[1] Subsection B expressly covers affirmative acts of torture, abuse or excessive acts of corporal punishment, or disciplinary measures. Whereas subsection A is concerned with circumstances of neglect, which is characterized as acts of omission rather than commission. Accordingly, an inexcusable failure to act in discharge of one's duty to protect a child where such failure to act results in a substantial risk to the child's health or safety is an offense under R.C. 2919.22(A). *State v. Kamel*, 12 Ohio St.3d 306, 309, 466 N.E.2d 860 (1984); *see also State v. Esper*, 8th Dist. Cuyahoga No. 105069, 2017-Ohio-7069, ¶ 12, quoting Committee Comment to R.C. 2919.22 (offense of neglect is "'the violation of a duty to care, protection, or support which results in a substantial risk to [the child's] health and safety.'").

or household member" as "a parent or child of spouse, person living as a spouse, or former spouse of the offender."

{¶ 39} Moreover, merely having the legal status as a stepparent does not automatically cause the stepparent to stand in loco parentis to the stepchild. *See State v. White*, 116 Ohio App. 522, 189 N.E.2d 160 (2d Dist.1962), paragraph five of the syllabus; *see also State v. Erwin*, 1st Dist. Hamilton No. C-920293, 1993 Ohio App. LEXIS 1127 (Feb. 24, 1992) (stepfather does not automatically stand in loco parentis to the child of his wife, but if the stepfather takes the child into his home, supports, educates, and assumes the duties of a parent, he consents to stand in loco parentis to a stepchild).

{¶ 40} R.C. 2919.22 does not define, "in loco parentis." However, the Ohio Supreme Court in *State v. Noggle*, 67 Ohio St.3d 31, 615 N.E.2d 1040 (1993), set forth the following definitions:

> The term "in loco parentis" means "charged, factitiously, with a parent's rights, duties, and responsibilities." *Black's Law Dictionary* 787 (6th Ed.1990). A person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding. A "person in loco parentis" was grouped with guardians and custodians in the statute because they all have similar responsibilities.
>
> The phrase "person in loco parentis" * * * applies to a person who has assumed the dominant parental role and is relied upon by the child for support. This statutory provision was not designed for teachers, coaches, scout leaders, or any other persons who might temporarily have some disciplinary control over a child. Simply put, the statute applies to the people the child goes home to.

*Id.* at 33.

**{¶ 41}** The following factors should be considered when determining whether a person is acting in loco parentis:

> (1) the person is charged with a parent's rights and responsibilities; (2) the person has assumed the same duties as a guardian or custodian; (3) the person has assumed a dominant parental role; (4) the child relies upon the person for support; (5) the child "goes home" to the person; (6) the person's relationship with the child is close, supportive, and protective; (7) the person has the intention of acting as a parent, which is shown by the acts, conduct, and declaration of the person; (8) the person intentionally assumes the obligations incidental to the parental relationship; and (9) the person is the primary caretaker for the child while the biological parent is absent due to, for example, employment.

*State v. Abubakar*, 10th Dist. Franklin No. 11AP-440, 2011-Ohio-6299, ¶ 10.

**{¶ 42}** In this case, no testimony or evidence was presented that would support any of these factors. Although Primous testified that he was married to the children's mother, paid a utility bill, and was on the lease of the residence, evidence was also presented that Primous and the victim had an estranged relationship for approximately five months, he did not pay the utility bills, he does not and had not lived at the residence during those estranged months, he surrendered his keys to the victim, and his name was removed from the lease. Absolutely no testimony was presented regarding his interactions with the children on prior occasions, any maintenance or supportive role he provided the children, or that he acted as a "factitious" parent. Accordingly, the evidence is insufficient to find that Primous was a person acting in loco parentis.

**{¶ 43}** The state also contends that Primous "had *control* of the four children as well as the victim" when he "forcefully gained entry to the home, without

permission, while in possession and brandishing a firearm." (Emphasis added.) The state seems to claim that the defendant's actions or conduct satisfies the duty element, i.e. custody or control, found in R.C. 2919.22(A). We disagree.

{¶ 44} "[T]he phrase 'custody or control,' must mean something other than in loco parentis, or the phrase becomes superfluous." *State v. Schoolcraft*, 11th Dist. Portage No. 91-P-2340, 1992 Ohio App. LEXIS 2782, 3 (May 29, 1992). "The relationship must be more than a causal relationship, but something less than being in loco parentis." *State v. Stout*, 3d Dist. Logan No. 8-06-12, 2006-Ohio-6089, ¶ 17. A "'person having custody or control,' can apply to someone physically entrusted with the care of a child * * *." *State v. Kirk*, 10th Dist. Franklin No. 93AP-726, 1994 Ohio App LEXIS 1189, 9 (Mar. 24, 1994). Moreover, the control over the child need not be ongoing, but instead, may be temporary. *State v. Brooks*, 8th Dist. Cuyahoga Nos. 75711 and 75712, 2000 Ohio App. LEXIS 1354, 25 (Mar. 30, 2000) (grandmother who was providing temporary child care ignored child's symptoms and failed to seek medical care).

{¶ 45} In cases where a person was found to have "custody or control" over a child, a duty or an exercise of care to the children must be present. *See, e.g., State v. Curry*, 8th Dist. Cuyahoga No. 105203, 2018-Ohio-4771 (defendant had custody or control because he was babysitting the children, the children viewed him as an authority figure); *State v. Thompson*, 2017-Ohio-9044, 101 N.E.3d 632 (7th Dist.) (defendant exercised control over children despite mother's presence because he lived with the children, the children called him "dad," he provided support in the

form of food stamps, and parental services such as cooking, household rule enforcement, and child care); *State v. Huffman*, 8th Dist. Cuyahoga No. 93000, 2010-Ohio-5116, ¶ 30 (defendant had custody or control over nephew who was in the backseat of the car); *State v. Masterson*, 8th Dist. Cuyahoga No. 88102, 2007-Ohio-1145 (defendant in custody or control of child because he lived with the child and child's mother, and acted as if he were the child's father); *State v. Smith*, 8th Dist. Cuyahoga No. 68745, 1996 Ohio App. LEXIS 214 (Jan. 25, 1996) (grandfather found to have "custody and control" over children where testimony showed children and their mother lived with grandparents for over two years); *Kirk* (defendant who saw and played with wife's biological child on a daily basis, and the child referred to defendant as his "buddy," had more than a casual relationship, but less than a legal relationship, sufficient evidence presented that defendant had control over the child as they were playing on the swing set); *Schoolcraft* (person acting as a babysitter).

{¶ 46} Based on the foregoing, we find that the term "custody or control" refers to the relationship between the defendant and the child that creates the defendant's duty owed to the child. A person's "custody or control" is not the action or inaction that creates the substantial risk to the health or safety of the child.

{¶ 47} In this case, no testimony was presented that Primous was a person having custody or control over the children. Although Primous was married to the victim and at one time lived with the victim and her children, no testimony was presented that Primous took any responsibility or assumed any parental role toward the children. Although one of the children testified that he considered Primous as

his "stepfather," the other child did not refer to him as his stepfather, denied that Primous ever lived with them, and denied that his mother and Primous were in a relationship. Simply, the evidence was insufficient to prove that Primous was a person who owed a duty to the children because he was a person having custody or control over the children at the time of the incident as intended by R.C. 2929.22(A).

{¶ 48} We find that Primous created a substantial risk to the health or safety of the victim's children, and arguably committed other criminal offenses. However, in order to be convicted of child endangering, the additional element that he owed a duty of care to the children by either his relationship to them or the role he undertook to assume responsibility for them must also be proven beyond a reasonable doubt. In this case, no such evidence was presented. Accordingly, insufficient evidence was presented to support Primous's convictions for child endangering.

{¶ 49} Primous's first assignment of error is sustained in part and overruled in part.

## C. Manifest Weight of the Evidence

{¶ 50} Primous contends in his second assignment of error that his convictions are against the manifest weight of the evidence.

{¶ 51} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, 132 Ohio

St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), paragraph two of the syllabus.

{¶ 52} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief." *Eastley* at ¶ 12, quoting *Thompkins* at 387. In a manifest weight analysis, this court sits as a 'thirteenth juror,' and reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 53} We initially note that Primous makes no argument regarding his conviction for aggravated burglary. Accordingly, we will not address this conviction under this assignment of error. *See* App.R. 16(A)(7). Moreover, he does not separately argue why his convictions for aggravated menacing and telecommunications harassment are against the manifest weight evidence; rather he asserts that those offenses should be reversed "for the same reasons that they are not supported by sufficient evidence." Accordingly, this court summarily rejects Primous's manifest-weight challenge to these convictions. *Id.*; *State v. Sparent*, 8th Dist. Cuyahoga No. 96710, 2012-Ohio-586, ¶ 11.

{¶ 54} Primous, however, specifically challenges his convictions for the firearm specifications because the victim did not disclose in her 911 dispatch calls that Primous had a gun, and three different witnesses each provided a different description of the gun.[2] He further maintains that the victim was not believable and his testimony was more consistent and credible.

{¶ 55} Admittedly the victim did not tell 911 dispatch that Primous had a gun. However, this detail does not render his convictions as being against the manifest weight of the evidence. All three witnesses testified that Primous pointed a gun at the victim. The children described the color of gun differently — gray and black versus black with an orange handle — but each described it as being a handgun. The children admitted that they were scared, and according to the victim, were on the bedroom floor. These minor inconsistencies, compared with the remaining unrefuted physical evidence, do not render Primous's convictions as being against the manifest weight of the evidence.

{¶ 56} Primous admitted that he "mooshed" the victim in the face causing her injuries. We note that the record before us does not explain how Primous "mooshed" the victim's face, but the record reveals that Primous demonstrated the action during his testimony in front of the trial judge, who was the trier of fact in this case. Accordingly, the trial judge was in the best position to determine whether the

_____

[2] Primous contends that his "conviction" for felonious assault is also against the manifest weight of the evidence. However, as previously discussed, the felonious assault offense merged with the aggravated burglary offense. Accordingly, this court will not review the finding of guilt for felonious assault.

victim's injury was more consistent with being "mooshed" or struck by a handgun in the face.

{¶ 57} Primous also places much emphasis on the fact that the court heard testimony that shots were fired into the victim's house after Primous fled from her home. According to Primous, this testimony and evidence was irrelevant to the charges against him and did not prove that he had a firearm on his person when he assaulted the victim. Primous is correct. However, the firearm specifications correlated with the aggravated burglary and felonious assault offenses; Primous was not charged with any offense involving discharging a firearm into a residence. Moreover, the evidence clearly demonstrates that the shots were fired into the victim's residence after the police were called to the hospital where Primous was seeking medical treatment after allegedly getting shot himself. In a bench trial, the trial judge is presumed to know the law and to consider only the relevant, material, and competent evidence in arriving at a decision. *See State v. Bays*, 87 Ohio St.3d 15, 26-27, 716 N.E.2d 1126 (1999). The testimony about the subsequent gunshots did not contribute to Primous's convictions for the firearm specifications.

{¶ 58} Accordingly, this is not the exceptional case where the trier of fact clearly lost its way and created such a manifest miscarriage of justice that Primous's convictions must be reversed.

## D. Other Acts Evidence

{¶ 59} In his fourth assignment of error, Primous contends that he was deprived of a fair trial and due process by the admission of other acts and irrelevant

evidence. Specifically, he contends the testimony about shots being fired into the victim's home was irrelevant and prejudicial, and the state's use of his prior convictions was improper under Evid.R. 404(B).

{¶ 60} As previously discussed, Primous was not charged with any offense relating to the shots that were allegedly fired into the victim's home, and the evidence demonstrates that Primous was not in the area during this time. In fact, the victim testified that she did not see who fired the shots into her home. Although the testimony was irrelevant, we are again mindful that this was a bench trial where the trial judge is presumed to know the law and to consider only the relevant, material, and competent evidence in arriving at a decision. *See Bays*, 87 Ohio St.3d at 26-27, 716 N.E.2d 1126.

{¶ 61} Primous further contends that the state used improper and prejudicial Evid.R. 404(B) other acts evidence during its closing when the state remarked about Primous's prior convictions for burglary and attempted carrying a concealed weapon. Primous's argument is without merit.

{¶ 62} First, the state made these remarks during closing, which is not evidence for the court to consider. *See, e.g., State v. Manago*, 38 Ohio St.2d 223, 227, 313 N.E.2d 10 (1974). Additionally, the state's remarks in closing properly referred to the prior convictions for impeachment. Reviewing the state's entire closing argument reveals that the state mentioned Primous's prior convictions to refute his credibility, and not as extrinsic evidence of Primous's propensity to commit the offenses charged. *See, e.g., State v. Lane*, 118 Ohio App.3d 230, 692

N.E.2d 634 (8th Dist.1997).  Finally, the trial court heard Primous testify about his prior convictions; thus, the court could consider those prior convictions in assessing Primous's credibility and whether to believe his version of events.

{¶ 63} Accordingly, Primous was not denied a fair trial or due process.  The fourth assignment of error is overruled.

{¶ 64} Judgment affirmed, in part, and reversed in part.

It is ordered that the parties share equally the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's convictions having been affirmed, in part, any bail pending is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

MICHELLE J. SHEEHAN, J., CONCURS; and
MARY EILEEN KILBANE, J., CONCURS IN JUDGMENT ONLY