[Cite as *State v. Maxey*, 2021-Ohio-438.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 109305 |
| v. | : | |
| DREQUELL MAXEY, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; VACATED IN PART; AND REMANDED
**RELEASED AND JOURNALIZED:** February 18, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-640032-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brian Kraft, Assistant Prosecuting Attorney, *for appellee.*

John F. Corrigan, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} A jury found defendant-appellant Drequell Maxey guilty of two counts of felonious assault and four counts of improperly discharging a firearm at or into a habitation. Maxey was acquitted of counts attempted murder, rape and

felonious assault. On appeal in his two assignments of error, Maxey challenges the evidence underlying his convictions. We affirm in part, vacate in part and remand.

**Assignments of Error**

> I. Appellant's four discharge into a habitation convictions were not supported by legally sufficient evidence as required by state and federal due process.

> II. Appellant's convictions were against the manifest weight of the evidence.

**Relevant Background**

{¶ 2} During the late hours of April 12, 2019, and early the next morning, bullets were fired into both the first- and second-floor apartments located 10808 Parkview Avenue in Cleveland, Ohio. Gunfire into the first-floor apartment struck and injured the victim, C.W. The bullet fired into the second-floor apartment lodged into the couch upon which Cymone Wilson rested. Both C.W. and Alexis Stewart reported and later testified with certainty that Maxey was the shooter.

{¶ 3} The police investigation revealed that inside the first-floor apartment there was a defect in the ceiling that was consistent with a bullet being fired from inside the first-floor unit. Officers recovered a spent .380 shell casing in the immediate vicinity. Tracing the path of the bullet into the upstairs apartment, officers found the corresponding bullet hole through the floor and recovered the bullet itself from the nearby couch in the second-floor unit.

{¶ 4} The investigation also revealed a defect in the front door of the first-floor unit consistent with a bullet being fired into the apartment from the outside.

Officers recovered a second spent .380 caliber shell casing from the front yard near the door.

{¶ 5} Eyewitness testimony further explained the crimes and implicated Maxey as the perpetrator.

**C.W.**

{¶ 6} C.W. testified that she met Maxey before April 12 and knew him by the nickname, "Lightbright." She explained that her first encounter with him occurred at her apartment and that Maxey and his "cousin" came over for "a few hours" and that she had sexual intercourse with Maxey during that encounter. C.W. saw Maxey again at a nightclub the week before April 12. C.W. stated that on that occasion they "just spoke, cussed it out, coughed up it, kept pushing," though she did not further elaborate about the interaction.

{¶ 7} On April 12, C.W. and Stewart went to the same nightclub and again encountered Maxey there. C.W. bumped into him as the club was closing and gave him a hug. She explained that they "spoke," and were "giggling and laughing." C.W. and Stewart were picked up from the club by a friend named "Antwone."

{¶ 8} C.W., Stewart and Antwone went back to C.W.'s apartment that she shared with Stewart. Stewart was texting with Maxey and informed C.W. that Maxey "missed [C.W.]," "wanted to see [her]," "spend the night" and "wanted to come over" with his brother. Although C.W. was not enthusiastic about Maxey coming to the home, Stewart nevertheless wanted to "see" Maxey's brother.

{¶ 9} Shortly thereafter, Maxey arrived at the apartment with his brother. C.W. observed that Maxey was intoxicated and "barely" able to "stand up straight." C.W. explained that he was "too touchy feely" with her despite her demonstrated lack of interest. Maxey persisted and followed C.W. around the house. C.W. asked Antwone to leave. Maxey continued to "grab all on [her] and yank all on [her]" as she was seeing Antwone out.

{¶ 10} Ultimately C.W. had enough of Maxey's belligerence and wanted to extricate herself from the situation. She told Stewart that Maxey and his brother could stay in the living room but that she was going to take a shower and go to bed. While C.W. was in the bathroom, Maxey continued after her, tried to get into the bathroom and waited by the door. When she came out, Maxey grabbed her.

{¶ 11} C.W. told Maxey that she would have sex with him, but that after that he had to leave. Before that, C.W. went to put some food away in the kitchen and while she was doing so, Maxey moved C.W.'s daughter out of C.W.'s bed, taking the child to her own bedroom. C.W. was not happy about Maxey doing this and yelled at him.

{¶ 12} C.W. heard yelling and thought the brother and Stewart were arguing. She heard the brother yelling about wanting to leave. Maxey, who was naked, wanted to finish having sex first and repeatedly told his brother to "hold up" and "wait a minute." The argument between the brother and Stewart escalated. Stewart informed C.W. that the brother was "trying to have some girl pull up and fight [C.W.]"

{¶ 13} Maxey again told his brother to "hold on" and the brother informed Maxey that he was going to leave because his ride was there. Maxey told him again to "hold up" and "wait a minute," and tried to start having sex with C.W. again. C.W. was no longer interested in sex and told him so. The brother went outside to a car driven by an unknown woman that was parked in front of the apartment. C.W. told Maxey to stop and that she wanted him to leave. C.W. testified that Maxey proceeded to force himself on her.

{¶ 14} After Maxey finished, he got up and began to get dressed. C.W. saw that Maxey was "feeling happy" and that he "bust out laughing and stuff." C.W. "went into a panic" and started "flipping out" and was trying to force him out of her apartment. An altercation ensued. Maxey called her "all type of names" and told her that "that's why I f***** your friend too. And she sucked my d***." He laughed at her.

{¶ 15} C.W. testified that the brother came back in the house and she told him to "come get [Maxey]." The brother thought this was funny and began recording C.W. before going outside to sit in the car.

{¶ 16} Maxey was still in the apartment. The altercation with C.W. escalated and became physical. C.W. tried to force Maxey out of the house while he was still getting dressed. He put his hands around her neck and in her face and shoved her. C.W. fought back, punched him in the face while still trying to get him out of the house. After she hit Maxey, he drew a pistol and fired once into the ceiling. C.W. continued to try to force Maxey out of the apartment and yelled for Stewart to go

check on her daughter.  After C.W. stated that Maxey was "just screaming.  Like he found it funny.  He was screaming, laughing.  Like screaming, laughing."

{¶ 17}  C.W. testified that she was finally able to force Maxey out the door and that he was still holding the gun when she did this.  As she was closing the door, Maxey began to shoot again, shooting three more times and hitting C.W.  When asked if she was able to see Maxey fire these shots, C.W. responded "[y]es.  He was shooting them as he was going down the stairs.  But I was closing my door.  I didn't know if they were going to hit me or not."  She further explained that there was no one on the front porch when she forced Maxey outside and he started shooting again.  C.W. stated that "[t]he brother was standing in front of the car still."  C.W. confirmed that she was able to see Maxey fire the shots into her apartment.  According to C.W., Maxey was the only person with a gun.

{¶ 18}  C.W. testified that she had to have surgery to remove the bullet fragments, that she has five separate scars as a result of being shot and that she stayed in the hospital for "about a week and a half."

**Cymone Wilson**

{¶ 19}  Cymone Wilson testified that she lived in the second-floor unit with her mother and son and that, at the time of these events, she was pregnant.  Wilson was friends with C.W. and knew that Stewart was staying in her apartment.  On the night of the shooting, Wilson heard C.W., Stewart and two men talking loudly in the apartment below.  Wilson recognized C.W.'s voice but did not recognize either of the

men's voices.  Wilson explained that the "walls are pretty thin."  She testified that she never saw either of the men whose voices she heard.

{¶ 20} Wilson stated that when she first heard the voices downstairs, "[i]t wasn't no argument.  It wasn't even a sign that there was going to be an argument, you know, just coming back from drinks and, you know, that's the loudness that I heard at the beginning."

{¶ 21} At some point, the music stopped and Wilson heard C.W. arguing with one of the men.  "It sounded like it started in [C.W.'s] bedroom."  Wilson did not know about what they were arguing, but heard them "going back and forth calling each other names, not necessarily [C.W.] calling him a name but he was calling [her] names."  Wilson heard C.W. trying to get the man to leave and testified that "[i]t sounded like there was some type of scuffle going on between them."

{¶ 22} Wilson heard a gunshot, but, in that moment, did not recognize it as such, explaining "I was — where it came through, it was the couch right there which I was laying on.  And this — it vibrated the whole floor basically."

{¶ 23} She heard Stewart repeatedly yelling to the man who was outside "[c]ome get your brother, come get your brother."  She then heard a male voice outside respond "I don't have nothing to do with that.  That's not my business."  Wilson testified that after she heard the first gunshot, "literally like two or three seconds later," she heard two more shots.  Wilson clarified that "it was about two, two or three gunshots after" she heard the first.  Wilson then went downstairs to see what was going on and saw Stewart running out the door and C.W. on the floor.

{¶ 24} Wilson testified that after she heard the first gunshot, she looked out the window "to see if somebody was outside and then that's when I just seen the other guy going back and forth and [Stewart] was telling him to come in the house * * * to get his brother." It was dark outside and Wilson was not able to see the man's face. Wilson did not see a car in front of the house, but did see one parked "next door."

**Alexis Stewart**

{¶ 25} Alexis Stewart testified that she was previously acquainted with Maxey by way of his "cousin" and that she knew Maxey by the nickname "Drakey." Stewart stated that she met the man referred to as Maxey's "brother" on the evening in question, at a nightclub. Stewart testified that she and C.W. returned to the apartment with a man named "Antwone," but that he did not stay.

{¶ 26} Although Stewart said there was no plan for anyone else to join them at the apartment, there came a time that they heard a knock at the door. They determined it was Maxey and let him in. At some point, the brother whom Stewart met earlier at the club came to the apartment asking for Maxey. Stewart told him that Maxey was "in the back with [C.W.]" Stewart allowed him to come in and they sat on the couch and smoked marijuana until "they were done doing what they were doing." Stewart stated that at one point the brother was on his phone arguing with his girlfriend and that he went outside to continue arguing with her. Stewart testified that the brother had a gun. She explained that the brother was "not a

problem" that night and that she "kept trying tell him to come get [Maxey]" when he was inside fighting with C.W.

{¶ 27} Stewart testified that she heard arguing and commotion and went to check on C.W.'s daughter. When she came back, she saw C.W. trying to push Maxey out the door. Stewart saw Maxey reach for a gun at his hip and shoot into the ceiling. She explained that Maxey looked "very angry like he was – like he was ready to kill us both." Stewart stated she went back to C.W.'s daughter's room and heard more gunshots approximately five to ten seconds after the first shot. She also heard C.W. screaming that she had been shot. Stewart testified that she did not see C.W. get shot.

**Law and Analysis**

**Sufficiency of the Evidence**

{¶ 28} In the first assignment of error, Maxey challenges his four improper discharge convictions as being based on insufficient evidence. The state concedes that it failed to prove two of those counts with sufficient evidence. We agree with the state that two improper discharge convictions are improper. As Maxey observed, in this case only "two habitations were involved," Wilson's second-floor apartment and C.W.'s first-floor apartment. *See State v. Grayson*, 2017-Ohio-7175, 95 N.E.3d 1025, ¶ 8 (8th Dist.) ("[Improper discharge] occurs when an offender fires a gun into someone's habitation."). Accordingly, two of the convictions are erroneous. As to the remaining two counts of improper discharge, as discussed below, we find the state presented sufficient evidence to establish that Maxey fired a gun into both.

{¶ 29} A challenge to the sufficiency of the evidence supporting a conviction requires a determination as to whether the state met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41. When reviewing sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In a sufficiency inquiry, an appellate court does not assess whether the evidence is to be believed but whether, if believed, the evidence admitted at trial would support a conviction beyond a reasonable doubt. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25; *Jenks* at paragraph two of the syllabus.

{¶ 30} R.C. 2923.161(A)(1) provides:

> No person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual.

R.C. 2901.22(B) provides:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 31} Maxey argues that the state's evidence is insufficient to prove improper discharge into Wilson's apartment because it failed to prove that he was "aware or probably aware" that there was a separate apartment above C.W.'s apartment. Maxey's claim is that the state, therefore, failed to prove he knowingly shot into Wilson's apartment. Maxey admits that he did fire a gun into the ceiling, but now asserts "the very purpose of firing a gun into a ceiling is to do no harm."

{¶ 32} The evidence presented through testimony, photographs, and police body camera footage clearly established that C.W.'s unit was one of multiple units in the house. From it, the jury could have found beyond a reasonable doubt that when Maxey fired into the ceiling, he did so knowing that he was doing so into a separate apartment. Put differently, none of the evidence introduced at trial indicated any possibility that the building was a single habitation.

{¶ 33} Testimony established that on the night of the shooting, Maxey was in C.W.'s apartment and, moreover, specifically places him in every room of that apartment but for the bathroom. C.W. testified that Maxey was in the living room, kitchen, C.W.'s bedroom and her daughter's bedroom. The evidence also established Maxey had previously been in C.W.'s apartment for "a few hours."

{¶ 34} The jury could reasonably conclude that Maxey was aware that he was in a first-floor apartment and that by shooting into the ceiling, the bullet would probably go into the apartment upstairs. *See* R.C. 2901.22(B) ("A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result * * *.); *see also State v. Dean*, 146 Ohio

St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 160 ("the jury could reasonably conclude that [defendant] was aware he would probably hit the house behind the car if his shots ricocheted * * * or missed the vehicle").[1]

{¶ 35} Maxey also argues that the state's evidence was insufficient to prove he was guilty of improper discharge into C.W.'s apartment because "[n]o one saw [him] discharge the gun from the outside," and that "[t]he jury necessarily drew an inference that he did."

{¶ 36} C.W. testified that after Maxey fired into the ceiling, she pushed him out the door and closed the door "real fast." Maxey was still holding the gun as C.W. pushed him out the door and she testified that she did see him shoot as she closed the door.

{¶ 37} Nevertheless, there is still one bullet hole through the door and C.W. admitted there is no window or peep hole in the door. Disregarding for the moment the evidence that there were multiple shots fired, and assuming that there was no direct evidence that it was Maxey who fired the bullet through the door, there is nevertheless ample circumstantial evidence that he did exactly that. *See State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 112, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

---

[1] Maxey argues that this court's decision in *State v. Tango*, 2015-Ohio-5133, 53 N.E.3d 961, ¶ 12 (8th Dist.) "is in error" to the extent that it "seems to suggest that the mens rea, knowingly is limited to the discharge of the firearm" and that "knowledge of the occupied structure" is "[i]nconsequential." We need not address this issue here because the evidence at trial clearly established both.

("'Circumstantial evidence and direct evidence inherently possess the same probative value * * *.'").

{¶ 38} We sustain the first assignment of error as to two improper discharge counts and overrule the assignment of error as to the remaining two improper discharge counts.

**Manifest Weight of the Evidence**

{¶ 39} In the second assignment of error, Maxey argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶ 40} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the other.'" (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). A manifest weight challenge attacks the credibility of the evidence presented and questions whether the prosecution met its burden of persuasion at trial. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26. It "addresses the evidence's effect of inducing belief," i.e., whether the state's or the defendant's evidence is more persuasive. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264.

{¶ 41} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d

652 (1982). Evaluating a challenge to the weight of the evidence requires this court to review the record, weigh the evidence and reasonable inferences, consider witness credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and thereby created a manifest miscarriage of justice. *Id.* Reversal on the weight of the evidence is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 42} Maxey argues that the physical evidence established that there was only a single bullet hole in the door and that this contradicts the testimony indicating that multiple shots were fired. Maxey also attacks C.W.'s and Stewart's testimony as "exaggerated, embellished, and fabricated" and further describes them as "volatile women." Finally, Maxey relates in this appeal that, after the shooting, C.W. and Stewart "became estranged" and he then speculates that Stewart provided testimony favorable to C.W. based on an ulterior motive to once again live with C.W., rent free. All of these claims are meritless.

{¶ 43} As to the purported discrepancy between the single bullet defect in the door and the testimony that multiple shots were fired, as previous stated, C.W. testified that Maxey began to shoot before she closed the door. When asked if she was able to see Maxey fire the shots she answered, "[y]es. He was shooting them as he was going down the stairs. But I was closing my door. I didn't know if they were going to hit me or not." This does not amount to a conflict in the evidence.

{¶ 44} Moreover, we note that C.W.'s testimony about her subsequent surgery further explains why there were not additional bullet defects in the house:

> [The doctors] was trying to get the bullet that's stuck in my ribs out but they couldn't, so they had to split me down the middle from my chest on down to make sure there wasn't no bullets up front or anything and took two things out.

{¶ 45} Maxey's personal attacks, levied against C.W. and Stewart notwithstanding, we do not find that the jury "clearly lost its way" creating a "manifest miscarriage of justice." *Thompkins* at 387.

{¶ 46} We note that in this case there were de minimis inconsistencies in the evidence. For example, C.W. testified that Maxey fired three shots after he fired the shot into the ceiling. Wilson testified that after the first shot there were "about two, two or three" more. Stewart testified that after the first shot she then heard "a couple gunshots." Similarly, C.W. testified that Maxey and his brother came over "it had to be like 2:30, 3:00" in the morning. Stewart testified that Maxey came over at approximately midnight or 1:00 AM.

{¶ 47} These minor inconsistencies, in light of the otherwise unrefuted evidence of guilt do not cause Maxey's convictions to be against the manifest weight of the evidence. *See State v. Primous*, 2020-Ohio-912, 152 N.E.3d 1002, ¶ 55 (8th Dist.) (inconsistent testimony about color of gun pointed at victim, in light of other evidence, does not render conviction against manifest weight).

**{¶ 48}** Although Maxey's second assignment of error challenges that his "convictions" were against the manifest weight of the evidence, he fails to address, in any way, the convictions for felonious assault.

**{¶ 49}** There is no doubt, however, that there was ample evidence to support these charges. C.W. testified that Maxey shot her and as a result, she was hospitalized for over one week and underwent surgery to remove the bullet fragments which had struck her.

**{¶ 50}** Fundamentally, Maxey fails to identify any conflicts in the evidence, that in so resolving, the jury lost its way and thereby created a manifest miscarriage of justice. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶ 51}** We overrule the second assignment of error.

**{¶ 52}** We affirm Maxey's two felonious assault convictions. We vacate Maxey's two of the four improper discharge convictions and remand the case to the trial court for further proceedings for an election by the state of Ohio to be made as to which of the four counts of Improperly Discharging Into Habitation they elect to pursue and resentencing as to those counts.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

SEAN C. GALLAGHER, P.J., and
LARRY A. JONES, SR., J., CONCUR