[Cite as *State v. Lucas*, 2024-Ohio-842.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                  :

    Plaintiff-Appellee,              :

                                   No. 112519

    v.                               :

JUSTIN LUCAS,                                   :

    Defendant-Appellant.             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 7, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-674494-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Lisa J. Turoso and Kristen Hatcher, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Justin Lucas ("Lucas"), appeals from his convictions following a bench trial. He raises the following assignments of error for review:

1. The court violated Lucas's constitutional right to confrontation in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 of the Ohio Constitution when it admitted testimonial statements made by the non-testifying accuser through a 911 call and body camera footage over defense objection.

2. The trial court erred by admitting the body camera footage and the 911 call in violation of the Rules of Evidence which deprived Lucas of a fair trial and due process of law.

3. The trial court erred when it denied Lucas's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

4. The convictions are against the manifest weight of the evidence.

{¶ 2} After careful review of the record and relevant case law, we affirm the trial court's judgment.

## I. Procedural and Factual History

{¶ 3} In October 2022, Lucas was named in a five-count indictment, charging him with aggravated burglary in violation of R.C. 2911.11(A)(2), with one- and three-year firearm specifications (Count 1); domestic violence in violation of R.C. 2919.25(A), with one- and three-year firearm specifications (Count 2); and three counts of endangering children in violation of R.C. 2919.22(A) (Counts 3, 4, and 5). The indictment stemmed from allegations that Lucas verbally and physically assaulted his ex-girlfriend, S.L., in the presence of her minor children.

{¶ 4} The matter proceeded to a bench trial in January 2023. At the onset of trial, the prosecutor informed the court that despite the issuance of a subpoena and "numerous attempts" to contact S.L., the state was unable to secure S.L.'s presence

at trial. (Tr. 12.) Accordingly, S.L. did not testify or otherwise cooperate in the prosecution.

{¶ 5} On behalf of the state, Officer Robert Bjekic ("Officer Bjekic") of the Cleveland Police Department, testified that at approximately 10:30 p.m. on July 24, 2022, he responded to an apartment complex located in Cleveland, Ohio to investigate a report of domestic violence. Upon arriving at the scene, Officer Bjekic located S.L. and gathered pertinent information regarding the nature of the incident. Officer Bjekic's body camera was activated during his encounter with S.L. The video, marked state's exhibit No. 1, was played during Officer Bjekic's direct examination, and he narrated the relevant events as they unfolded.

{¶ 6} In relevant part, S.L. indicated that her ex-boyfriend, Lucas, unexpectedly arrived at her apartment complex and demanded to see their shared child. S.L. stated that Lucas did not reside with her and had not been around for "months." During their initial encounter, which occurred outside the apartment complex, Lucas became very hostile and brandished a firearm. He began pacing back and forth and threatened to kill himself and one of S.L.'s male acquaintances. S.L. stated that she attempted to calm Lucas down and eventually allowed him to see their son.

{¶ 7} After S.L. brought her and Lucas's child inside to get ready for bed, she realized that her other son was still outside the apartment complex. When S.L. went to look for the child, Lucas entered her apartment through an unlocked door without S.L.'s knowledge or consent. Once S.L. came back inside the apartment with her

son, Lucas initiated a physical altercation in the presence of the young children. Specifically, S.L. stated that Lucas grabbed her by the neck and pinned her against the hallway wall. Lucas then put his gun to her head and discharged the weapon "right across [her] face" and into the apartment wall. Although Lucas ran out the back door after he fired the gun, he had repeatedly threatened to return to the apartment within 24 hours to "bust windows out" if she did not leave.

{¶ 8} Based on the information gathered from S.L., Officer Bjekic ran Lucas's name through the Law Enforcement Automated Database System ("LEADS") and confirmed his identity and out-of-town address. When asked to describe S.L.'s demeanor at the scene, Officer Bjekic testified that she was scared and exhibiting significant signs of stress. She was crying, sweating profusely, and periodically needed breaks to catch her breath. Officer Bjekic further testified that he had ongoing concerns for S.L.'s safety given the nature of Lucas's threats and his use of a firearm. Accordingly, the police instructed S.L. to leave the apartment complex while they attempted to locate Lucas. (Tr. 26.) Finally, Officer Bjekic confirmed that a bullet hole and shell casing were observed inside S.L.'s apartment.

{¶ 9} Felipe DaVila ("DaVila") is a chief dispatcher for the Cleveland Police Department. DaVila testified that the department utilizes the recording system, Equature, to systematically store recorded 911 calls. DaVila stated that he reviewed the 911 call placed by S.L. on July 24, 2022. The 911 call, marked state's exhibit No. 2, was then played on the record in its entirety. During the call, S.L. requested police assistance and described the nature of her emergency. Specifically, S.L.

reported that Lucas put a gun to her head and discharged it into a wall. S.L. further stated that Lucas "was going crazy" and threatened to "be back" in 24 hours to "tear her house up" and "shoot bullets through her windows." Lastly, S.L. provided Lucas's name, his date of birth, and a brief description of his appearance. DaVila confirmed that the audio was "kept in the ordinary course of business" and constituted "a fair and accurate representation of the call that he reviewed for the purposes of [trial]." (Tr. 39-40.)

{¶ 10} On cross-examination, DaVila conceded that the 911 call was placed approximately 30 minutes after the incident and that there was no ongoing emergency. He explained, however, that the caller remained "fearful and upset" due, in part, to Lucas's threat to return to her home in 24 hours to cause additional harm. (Tr. 41.)

{¶ 11} Detective William Cunningham ("Det. Cunningham") of the Cleveland Police Department, testified that he was assigned to investigate the reported incident of domestic violence. In the course of his investigation, Det. Cunningham familiarized himself with the police report, reviewed Lucas's criminal history, and obtained a written statement from S.L. Det. Cunningham testified that during his interaction with S.L., she positively identified Lucas as the perpetrator by initialing a photograph retrieved from the Attorney General's Ohio Law Enforcement Gateway ("OHLEG").

{¶ 12} At the close of the state's case-in-chief, defense counsel raised objections to the admission of (1) Officer Bjekic's body-camera footage, and (2) the

911 call placed by S.L. on July 24, 2022. Following a brief discussion on the record, the trial court overruled the objections and admitted the exhibits into evidence. Defense counsel then made an oral motion for acquittal pursuant to Crim.R. 29, which the trial court denied.

{¶ 13} At the conclusion of trial, Lucas was found guilty of all charges.

{¶ 14} A sentencing hearing was held in February 2023. Upon hearing from the parties, the trial court found that Counts 1 and 2 were allied offenses of similar import and the state elected to proceed with sentencing on the aggravated burglary offense charged in Count 1. The trial court further determined that Counts 3-5 were allied offenses of similar import and the state elected to proceed with sentencing on the endangering children offense charged in Count 3. With respect to the offense of aggravated burglary, a felony of the first degree, the court sentenced Lucas to a three-year prison term on the firearm specification, to run prior and consecutive to an indefinite prison term of four to six years on the base offense. (Tr. 96-97.) The indefinite prison term was ordered to run concurrently with a sentence of time served on Count 3.

{¶ 15} Lucas now appeals from his convictions.

## II. Law and Analysis

### A. The Confrontation Clause

{¶ 16} In the first assignment of error, Lucas argues the trial court violated his constitutional right to confrontation by admitting testimonial statements through the 911 call and body-camera footage. Lucas contends that the primary

purpose of the 911 call and the subsequent police interrogation was to document past events for the purposes of a later criminal investigation or prosecution. He therefore urges this court to vacate his convictions.

{¶ 17} Once Lucas objected to the admissibility of S.L.'s out-of-court statements, the state, as the proponent of the evidence, bore the burden of establishing the admissibility of the statements. *State v. Smith*, 2023-Ohio-603, 209 N.E.3d 883, ¶ 86 (8th Dist.), citing *State v. Hill*, 12th Dist. Butler No. CA80-05-0053, 1981 Ohio App. LEXIS 14266, 4 (Mar. 1, 1981), and *United States v. Duron-Caldera*, 737 F.3d 988, 993 (5th Cir.2013) ("'[T]he government bears the burden of defeating [a] properly raised Confrontation Clause objection by establishing that its evidence is nontestimonial.'").

{¶ 18} We review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97. "'De novo review requires an independent review of the trial court's decision without any deference to the trial court's determination.'" *State v. McCullough*, 8th Dist. Cuyahoga No. 105959, 2018-Ohio-1967, ¶ 6, quoting *State v. Knox*, 8th Dist. Cuyahoga Nos. 103662 and 103664, 2016-Ohio-5519, ¶ 12.

{¶ 19} The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."

{¶ 20} Interpreting this amendment, the United States Supreme Court has recognized that the "admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 34, citing *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 657, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). The "'central concern'" of the Confrontation Clause is "'to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.'" *State v. Smith*, 2019-Ohio-3257, 141 N.E.3d 590, ¶ 10 (1st Dist.), quoting *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

{¶ 21} Because "only testimonial hearsay implicates the Confrontation Clause," the admission of nontestimonial statements does not violate the Sixth Amendment. *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 185. In this case, there is no indication in the record as to why S.L. did not appear to testify at trial. And, although S.L. had been subpoenaed, there is no indication that a bench warrant was requested to secure her appearance as a material witness. Because Lucas did not have a prior opportunity to cross-examine S.L., we must determine whether the challenged statements were testimonial.

### 1. "Testimonial" Statements and the Primary Purpose Test

{¶ 22} Whether statements are testimonial or nontestimonial depends on the primary purpose of the statements. *McKelton* at ¶ 185. In general, "statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). If, however, there is no such ongoing emergency and "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution," then the statements are testimonial. *Davis* at 822. In discussing the primary purpose test, the *Davis* Court noted that "[a] 911 call * * * and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827.

{¶ 23} In *Michigan v. Bryant*, 562 U.S 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), the court clarified "what *Davis* meant" by "an ongoing emergency" and its role in determining the "primary purpose" of an interrogation. *Id.* at 359. In rendering its decision, *Bryant* emphasized that "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 345. A court must consider "'the statements and actions of both the declarant and interrogators.'" *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 155, quoting *Bryant* at 367.

{¶ 24} Whether a risk still exists to the victims, the public, or the police is an important factor in the "ongoing emergency" inquiry. The *Bryant* Court noted that "[d]omestic violence cases * * * often have a narrower zone of potential victims than cases involving threats to public safety." *Id.* at 363. Nevertheless, the assessment of whether an ongoing emergency exists "cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." *Id.* If the witness is severely injured, then a court may be more likely to find an ongoing emergency existed. *Id.* at 365. Similarly, the type of weapon involved is also relevant, with an assailant with a gun posing a greater risk to the police and the public, even if the assailant is no longer on the scene. *Id.* at 364; *Jones* at ¶ 151.

{¶ 25} Although the existence of an ongoing emergency is a significant factor in the primary purpose analysis, "any conclusion determining that there is no ongoing emergency is not dispositive of the Confrontation Clause question." *State v. Williams*, 8th Dist. Cuyahoga No. 112481, 2024-Ohio-337, ¶ 26, citing *Cleveland v. Merritt*, 2016-Ohio-4693, 69 N.E.3d 102, ¶ 22 (8th Dist.). "Instead, 'whether an ongoing emergency exists is simply one factor * * * that informs the ultimate inquiry regarding the "primary purpose" of an interrogation.'" *Ohio v. Clark*, 576 U.S. 237, 245, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015), citing *Bryant* at 366. As previously stated by this court:

> In addition to whether there is an ongoing emergency, other relevant considerations to the primary purpose test include the formality versus informality of the encounter * * * and the statements and actions of

both the declarant and the interrogators, in light of the circumstances in which the interrogation occurs.

*Merritt* at ¶ 42.

{¶ 26} In *Bryant*, the court explained that "[a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the 'primary purpose of the interrogation.'" *Bryant*, 562 U.S at 360, 131 S.Ct. 1143, 1156, 179 L.Ed.2d 93. Thus, if the interrogation took place in police headquarters, then the witness's statements are likely testimonial. *See also State v. Sproles*, 6th Dist. Lucas No. L-22-1184, 2023-Ohio-3403, ¶ 30 (holding that a victim's statement to police was nontestimonial in part because it was made at the crime scene and not at the police station). Likewise, if the statements were given in response to a police interrogation, i.e., "knowingly given in response to structured police questioning," then they are more likely to be testimonial. *See Crawford*, 541 U.S. at 53, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 4.

{¶ 27} Finally, it is well settled that the primary purpose of a statement may change as the interrogation progresses, and "'a conversation which begins as an interrogation to determine the need for emergency assistance'" can "'evolve into testimonial statements.'" *Bryant* at 365, quoting *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224. The *Bryant* Court explained:

> This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a

perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis*, flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude "the portions of any statement that have become testimonial."

*Id.*, quoting *Davis* at 829.

{¶ 28} With the foregoing principles in mind, we separately review the contents of the 911 call and the body-camera footage. *See United States v. Arnold*, 486 F.3d 177, 189 (6th Cir.2007) ("Each victim statement * * * must be assessed on its own terms and in its own context to determine on which side of the [testimonial-nontestimonial] line it falls.").

**a. The 911 Call**

{¶ 29} This court has recognized that statements made during a 911 call are often found to be nontestimonial and are admissible if the statements satisfy a hearsay exception. *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 61 (8th Dist.). This is because a 911 caller is typically "speaking about events as they [are] actually happening" and "[a]lthough one might call 911 to provide a narrative report of a crime absent any imminent danger," 911 callers are usually facing ongoing emergencies. (Emphasis deleted.) *Davis* at 827. Under such circumstances, the 911 caller is not testifying, the 911 caller is not acting as a witness, and the statements of the 911 caller are not testimonial in nature. *Id.* at 827-828.

{¶ 30} Viewing the contents of the 911 call in its entirety, we find S.L.'s statements to the dispatcher were made during an ongoing emergency and were nontestimonial in nature. Although S.L. placed the emergency call approximately

30 minutes after Lucas had left the scene, she was distraught and continued to exhibit significant signs of stress. S.L. was crying and had difficulty keeping her composure while briefly describing the nature of her emergency. When questioned, S.L. expressed that she required immediate police assistance and the totality of the circumstances objectively indicate that her statements to the dispatcher were not made "to document past events" but were made with the "primary purpose" of obtaining protection and assistance in resolving an ongoing threat of gun violence. In turn, the dispatcher indicated that S.L.'s call was "a high priority" emergency based on the nature of Lucas's conduct, his use of a firearm, and his threat of future violence. Lucas remained armed and his whereabouts were unknown at the time the police were dispatched to the apartment complex. Thus, Lucas posed an ongoing threat and the dispatcher's questions were necessary to properly assess the nature and scope of the emergency to which law enforcement were responding. *See State v. Boyce*, 8th Dist. Cuyahoga No. 112610, 2024-Ohio-464, ¶ 18.

### b. Body-Camera Footage

{¶ 31} We similarly conclude that S.L.'s statements to the responding officers were nontestimonial under the primary purpose test. In this case, the circumstances of the encounter indicate that Officer Bjekic's primary purpose during "the initial interrogation" was to determine how to address an ongoing emergency from his standpoint as a first responder. Officer Bjekic sought information necessary to assess the nature of the injuries sustained by S.L. and her children, to determine whether the threat of immediate danger had subsided, and to identify and locate the

assailant. *See State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 21 (3d Dist.). Relatedly, S.L.'s statements were made with the primary purpose of enabling the police to meet an ongoing emergency. Here, S.L. continued to exhibit signs of great duress when the police arrived at the scene. She was crying, sweating profusely, and had trouble catching her breath. In addition, S.L. remained fearful and believed Lucas would return to fulfill his threats of future violence. Viewed objectively, we cannot say the primary purpose of S.L.'s statements to the police was to document past events for the purposes of a later criminal investigation or prosecution. Rather, the video footage objectively demonstrates that S.L.'s primary concern was narrowly focused on securing the safety of herself and her young children.

{¶ 32} Notwithstanding this being a traditional domestic violence scenario, which would normally narrow the zone of potential victims, because the appellant possessed a weapon, the zone of potential victims was expanded to the entire community. In this case, the responding officers learned that Lucas arrived at the apartment complex in a highly emotional state. He proceeded to brandish a firearm in the presence of innocent bystanders and threatened to kill himself and an unidentified male who was present at the scene. Lucas then entered S.L.'s apartment without her permission and proceeded to physically assault her in the presence of her young children. The incident culminated with Lucas discharging a deadly weapon inside the apartment residence. Significantly, the risk of potential harm did not cease once Lucas fled the scene. Lucas remained armed and his threats indicated that he intended to return to the apartment if S.L. remained in the

residence. Collectively, Lucas's reckless disregard for the safety of those present at the scene of the incident, his erratic behavior, his possession of a weapon, and his threat of future armed violence reasonably suggested that a continuing threat extended to the police and the public. *Bryant,* 562 U.S. at 346, 131 S.Ct. 1143, 179 L.Ed.2d 93. *See also State v. Sproles*, 6th Dist. Lucas No. L-22-1184, 2023-Ohio-3403, ¶ 30-31; *State v. Ford*, 6th Dist. Lucas No. L-20-1054, 2021-Ohio-3058 at ¶ 21-24 (holding that body cam video of victim statements made to the police shortly after the crime occurred, while an assailant is potentially armed and still at large, are nontestimonial in nature).

{¶ 33} Finally, there is no dispute that the interrogation captured by Officer Bjekic's body camera occurred in S.L.'s apartment, not police headquarters. The informality further suggests that the officer's primary purpose was to address what he considered to be an ongoing emergency, "and the circumstances lacked a formality that would have alerted [S.L.] to or focused [her] on the possible future prosecutorial use of [her] statements." *Id*. at 347; *Clark*, 576 U.S. 237, 135 S.Ct. 2173, 192 L.E.2d 306 (2015) ("A formal station-house interrogation * * * is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused.").

{¶ 34} Based on the foregoing, we conclude that the statements reflected in S.L.'s 911 call and the body-camera footage were made in informal settings during an ongoing emergency. The primary purpose of each dialogue was to assess the

threat and to meet an ongoing emergency. Accordingly, S.L.'s statements were nontestimonial in nature and not subject to the Confrontation Clause. *See State v. Tomlinson*, 8th Dist. Cuyahoga No. 109614, 2021-Ohio-1301, ¶ 43 (finding body-camera statements were not testimonial because they were made to law enforcement in the course of responding to an emergency situation and because the victims "had just been shot at and called the police to seek protection").

{¶ 35} The first assignment of error is overruled.

## B. Hearsay Testimony

{¶ 36} In the second assignment of error, Lucas argues the trial court abused its discretion by admitting the 911 phone call and body-camera footage into evidence. Lucas contends that even if S.L.'s statements were nontestimonial, the trial court committed reversible error by allowing hearsay evidence to be admitted pursuant to the excited utterance exception, Evid. R. 803(2).

{¶ 37} "A trial court has broad discretion regarding the admission of evidence, including whether evidence constitutes hearsay and whether it is admissible hearsay." *In re A.M.*, 8th Dist. Cuyahoga No. 110551, 2022-Ohio-612, ¶ 22, citing *Solon v. Woods*, 8th Dist. Cuyahoga No. 100916, 2014-Ohio-5425, ¶ 10. "We therefore will not disturb a trial court's decision regarding the admissibility of hearsay evidence absent an abuse of discretion." *Id.*, citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984).

{¶ 38} Lucas correctly notes that "even if an out-of-court statement is nontestimonial, for evidence of that statement to be properly admitted at trial, it

must also be admissible under the rules of evidence, including the rules against the admission of hearsay." *State v. Jones*, 2023-Ohio-380, 208 N.E.3d 321, ¶ 99 (8th Dist.). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally not admissible unless it falls within one of the exceptions to the rule against hearsay. Evid.R. 802, 803, and 804; *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987). One such exception is an excited utterance, which Evid.R. 803(2) defines as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

{¶ 39} For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) there must be a startling event that produces a nervous excitement in the declarant, (2) the statement must have been made while the declarant was still under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have personally observed the startling event. *See, e.g., State v. Renode*, 8th Dist. Cuyahoga No. 109171, 2020-Ohio-5430, ¶ 27, citing *State v. Taylor*, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993), and *Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 166.

{¶ 40} Although the passage of time between the event and the declaration is relevant, "[t]here is no per se amount of time after which a statement can no longer be considered to be an excited utterance." *State v. Taylor*, 66 Ohio St.3d 295, 303,

612 N.E.2d 316 (1993). In fact, to be an excited utterance, the statement need not be strictly contemporaneous with the startling event. *State v. Duncan*, 53 Ohio St.2d 215, 373 N.E.2d 1234 (1978), paragraph one of the syllabus. "'[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.'" *Taylor* at *id.*, quoting *Duncan* at 219-220. Thus, the relevant inquiry is whether the declarant is still under the stress of the event or whether the statement was the result of reflective thought. *Duncan* at *id.*; *see also In re C.C.*, 8th Dist. Cuyahoga Nos. 88320 and 88321, 2007-Ohio-2226 (finding an excited utterance even though 27 days passed between the event and the statement); *State v. Duke,* 8th Dist. Cuyahoga No. 52604, 1988 Ohio App. LEXIS 3466 (Aug. 25, 1988) (finding an excited utterance when the statement was made ten days following an incident).

{¶ 41} After careful consideration, we find the disputed statements were properly admitted under the excited utterance exception. In this case, the record reflects that S.L. called 911 approximately 30 minutes after Lucas reportedly left her apartment. S.L. urgently sought police assistance and indicated that Lucas intended to return to her apartment to "tear up her house and harm her." (Tr. 41.) Undoubtedly, the statements made to the 911 dispatcher directly related to the violent behavior S.L. personally observed and experienced. And, although S.L. did not immediately contact the authorities, she continued to exhibit signs of distress during the duration of the emergency call. S.L. had difficulty maintaining her

composure and frequently cried while attempting to answer the dispatcher's questions. Based on these facts, we find S.L.'s statements within the 911 call are not the result of reflective thought and qualified as excited utterances. *See Cleveland v. Myles*, 8th Dist. Cuyahoga No. 111309, 2022-Ohio-4504, ¶ 25, quoting *State v. Martin*, 2016-Ohio-225, 57 N.E.3d 411, ¶ 59 (5th Dist.) ("911 calls are generally admissible as excited utterances or under the present sense impression exception to the hearsay rule.").

{¶ 42} Likewise, it is evident from the body-camera video that S.L. was under the significant duress when she provided statements regarding the startling event. In this case, Officer Bjekic testified that S.L. was "scared" and had difficulty controlling her emotions throughout their initial interaction. (Tr. 25-26.) He described her demeanor as follows:

> She was sweating a lot, profusely. I caught her out of breath a couple of times. I could tell that she was under — I mean, I know personally how I react to stress is how she was reacting and actually I had to tell her to take a breath, we had to pause the interview a couple times so she could catch her breath and be able to talk to me more clearly and get everything.
>
> * * *
>
> She would cry at moments and I would try to calm her and bring her back to level and then after she started talking about the situation she kind of started crying again and everything revamped and then I'd have to bring her back down.

(Tr. at *id*.) Under these circumstances, we find S.L.'s statements on the body-camera video are not the result of further reflective thought and were properly admitted under Evid.R. 803(2).

{¶ 43} Based on the foregoing, , we find the trial court did not err or abuse its discretion in admitting the recorded 911 call and body-camera footage into evidence.

{¶ 44} The second assignment of error is overruled.

### C. Sufficiency of the Evidence

{¶ 45} In the third assignment of error, Lucas argues the trial court erred by denying his motion for acquittal pursuant to Crim.R. 29 because his convictions are based upon insufficient evidence.

{¶ 46} Crim.R. 29(A) provides that a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."  "Because a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'" *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 47} In reviewing a challenge to the sufficiency of evidence, we determine whether the evidence, if believed, would convince the average juror of the defendant's guilt beyond a reasonable doubt.  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.  "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.  Our review is not to determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would

support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 48} "'Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 35 (8th Dist.), quoting *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18. Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *Id.*, citing *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Further, circumstantial evidence is not only sufficient, "'"but may also be more certain, satisfying, and persuasive than direct evidence.'"" *Id.* at ¶ 36, quoting *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 49} As stated, Lucas was convicted of aggravated burglary in violation of R.C. 2911.11(A)(2), with one- and three-year firearm specifications (Count 1); domestic violence in violation of R.C. 2919.25(A), with one-and three-year firearm specifications (Count 2); and three counts of endangering children in violation of R.C. 2919.22(A) (Counts 3, 4, and 5). However, because the trial court only imposed sentences of Counts 1 and 3 of the indictment, we need not consider the sufficiency of the evidence supporting the domestic-violence offense charged in Count 2 or the

endangering-children offenses charged in Counts 4 and 5. As recognized by this court:

> When counts in an indictment are allied offenses that are merged for the purposes of sentencing, the reviewing court need not consider the sufficiency or the weight of the evidence thereon because any error relating to those counts would be harmless. *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990); *State v. Tegarty*, 8th Dist. Cuyahoga No. 111855, 2023-Ohio-1369, ¶ 36, citing *State v. McFarland*, 162 Ohio St. 3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 25 (considering the sufficiency-of-the-evidence challenge only on those convictions surviving merger), and *State v. Myers*, 154 Ohio St. 3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 138 (merger of kidnapping count with aggravated-robbery and aggravated-burglary counts moots sufficiency-of-the-evidence claim regarding kidnapping count); *see also State v. Johnson*, 8th Dist. Cuyahoga No. 111618, 2023-Ohio-1367, ¶ 116. This rationale applies to both sufficiency and manifest weight challenges. *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23.

*State v. Harder*, 8th Dist. Cuyahoga No. 112051, 2023-Ohio-2384, ¶ 25. We therefore disregard Lucas's sufficiency and manifest weight arguments concerning Counts 2, 4, and 5.

### 1. Firearm Specifications

{¶ 50} We begin our analysis by addressing Lucas's challenge to the evidence supporting the one- and three-year firearm specifications attached to the aggravated burglary offense. The determination of whether Lucas was in possession and/or brandished a firearm during the incident on July 24, 2022, is relevant to our assessment of the underlying offenses.

{¶ 51} On appeal, Lucas argues the state did not present sufficient evidence to support the specifications because "there is no evidence that Lucas had a firearm

on or about his person," nor is there "evidence that Lucas displayed a firearm, brandished a firearm, indicated possession of a firearm, or used it to facilitate any offense." We find no merit to Lucas's position.

{¶ 52} R.C. 2941.141(A) governs the one-year firearm specification and requires the court to find that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense." R.C. 2941.145(A) governs the three-year firearm specification and requires the court to find that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶ 53} A "firearm" is "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant." R.C. 2923.11(B)(1). It includes an unloaded firearm and any firearm that is inoperable but that can readily be rendered operable. *Id.*

{¶ 54} In *Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541, the Ohio Supreme Court elaborated on the requisite proof to sustain a firearm specification:

> A firearm enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm.

*Id.* at paragraph one of the syllabus.

**{¶ 55}** In this case, the statements provided to the responding officers established that Lucas first brandished a firearm while pacing back and forth in the front of the apartment complex. S.L. reported that Lucas then threatened to kill himself and an unidentified male who was present at the scene. Thereafter, Lucas entered S.L.'s apartment without her permission and brandished the firearm a second time. During this confrontation, Lucas pointed the gun directly at S.L. and fired a "warning" shot into the wall behind her. A bullet hole and a spent shell casing were later observed at the scene by responding officers.

**{¶ 56}** Based upon these facts, we find the firearm specifications were supported by sufficient evidence. Unquestionably, Lucas had a gun under his control during the entirety of the incident and facilitated the underlying offenses while brandishing a gun in a threatening manner. Lucas then demonstrated the operability of the firearm by discharging a live round inside S.L.'s apartment. Accordingly, we find that Lucas possessed, brandished, and used a firearm while committing the offenses pursuant to R.C. 2941.145(A). We also find that Lucas had a firearm on his person and under his control while committing the offenses pursuant to R.C. 2941.141(A).

### 2. Aggravated Burglary

**{¶ 57}** The statute governing Lucas's aggravated burglary conviction provides, in relevant part:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:

&ast; &ast; &ast;

> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

R.C. 2911.11(A)(2).

{¶ 58} On appeal, Lucas claims the state failed to present evidence demonstrating that he committed a trespass by force, stealth, or deception. Lucas argues there was no direct witness testimony that he was not a lawful tenant or lacked authorization to enter the premises. He further notes that "the only evidence in the record is that the door was unlocked." Finally, Lucas contends that there was no evidence that he had a firearm on his person or under his control during the incident.

{¶ 59} As relevant to the aggravated burglary statute, "force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Any force effecting entrance, however slight, satisfies this element. *In re A.C.D.*, 12th Dist. Warren No. CA2014-06-085, 2015-Ohio-232, ¶ 12. Thus, it is well established that "[t]he opening of a closed door, even if unlocked, falls under the definition of force." *State v. Knuckles,* 8th Dist. Cuyahoga No. 86053, 2005-Ohio-6345, ¶ 24*; see also State v. Stump*, 5th Dist. Perry No. 13-CA-0006, 2014-Ohio-1706, ¶ 18; *State v. Wilson*, 8th Dist. Cuyahoga No. 80270, 2002-Ohio-3107; *State v. Lane*, 50 Ohio App.2d 41, 361 N.E.2d 535 (10th Dist.1976).

{¶ 60} The term "stealth" is not defined in the Ohio Revised Code. However, Ohio courts have found that the term refers to "'any secret, sly or clandestine act to

avoid discovery and to gain entrance into or to remain within a residence of another without permission.'" *State v. Sims*, 8th Dist. Cuyahoga No. 84090, 2005-Ohio-1978, ¶ 5, fn. 3, quoting *State v. Ward*, 85 Ohio App.3d 537, 620 N.E.2d 168 (3d Dist.1993). *See also State v. Harris*, 6th Dist. Lucas Nos. L-06-1402 and L-06-1403, 2008-Ohio-6168, ¶ 93.

{¶ 61} The Ohio Revised Code states that a criminal trespass occurs when a person, "without privilege to do so," "knowingly enters or remains on the land or premises of another." R.C. 2911.21(A)(1). "'Privilege' means an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12). A privilege may terminate or be revoked. *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987). Thus, Ohio courts have recognized that even if one is granted permission to enter a premises of another, "'permission to enter a home is deemed terminated by the act of committing an offense of violence against a person authorized to revoke the permission.'" *State v. Metcalf*, 2d Dist. Montgomery No. 24338, 2012-Ohio-6045, ¶ 20, quoting 2 Katz, Martin, Lipton & Crocker, Criminal Law, Section 104:6 (3d Ed.); *State v. Hart*, 2d Dist. Montgomery No. 19556, 2003-Ohio-5327, ¶ 43 ("[E]ven if Hart did not initially trespass, we conclude that a strong inference arises that once the shooting started, any permission Hart might have had to be in the residence was withdrawn, and that Hart knew that any privilege to remain on the premises was revoked."). *See also State v. Wilcox*, 10th Dist. Franklin No. 15AP-957, 2016-Ohio-7865, ¶ 32.

{¶ 62} In this case, the state's evidence demonstrated that Lucas secretly entered S.L.'s apartment through an unlocked door without S.L.'s knowledge or consent while she was outside searching for her child. Once S.L. returned to her apartment, she discovered Lucas inside her bedroom. During the unprovoked physical confrontation that ensued, S.L. pleaded with Lucas to "stop." (State's exhibit No. 1 at 9:20.) Lucas ignored S.L.'s request and forcefully remained in the apartment without privilege to do so and with the specific intent to facilitate the conduct constituting the offense of domestic violence. Regarding Lucas's tenancy, S.L.'s statements to the responding officers indicate that Lucas had a listed address located outside of Cuyahoga County and was not living with her in the apartment. Finally, as previously discussed the testimony and corresponding exhibits established that Lucas was in possession of a firearm during the entirety of the incident and fired the weapon while inside S.L.'s apartment.

{¶ 63} Viewing this evidence in a light most favorable to the prosecution, we find the state's evidence, if believed, was sufficient to establish the elements of aggravated burglary beyond a reasonable doubt.

### 3. Endangering Children

{¶ 64} Finally, Lucas's endangering children conviction is governed by R.C. 2919.22. The statute provides, in pertinent part:

> (A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

(1) Abuse the child[.]

{¶ 65} The necessary mens rea for the offense is recklessness. *State v. McGee*, 79 Ohio St.3d 193, 680 N.E.2d 975 (1997), syllabus; *State v. Bush*, 2020-Ohio-772, 152 N.E.3d 892, ¶ 7 (1st Dist.). "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶ 66} "Substantial risk" is defined as a "strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). A child endangering conviction may be based upon isolated incidents or even "a single rash decision" in which a parent recklessly puts his or her child's health or safety at risk. *State v. James*, 12th Dist. Brown No. CA2000-03-005, 2000 Ohio App. LEXIS 5905, 6-7 (Dec. 18, 2000). However, "'[t]o prove the requisite "substantial risk" element, * * * there must be some evidence beyond mere speculation as to the risk of harm that could potentially occur due to a single imprudent act.'" *State v. Hughes*, 3d Dist. Shelby No. 17-09-02, 2009-Ohio-4115, ¶ 21, quoting *Middletown v. McWhorter*, 12th Dist. Butler No. CA2006-03-068, 2006-Ohio-7030, ¶ 11.

{¶ 67} In his case, the indictment alleged that the three child-endangering offenses corresponded to three separate minors, to wit: L.L., d.o.b. 6/7/2018 (Count

3); J.T., d.o.b. 3/16/2017 (Count 4); and A.P., d.o.b. 9/13/2015 (Count 5). Again, our inquiry focuses on Count 3, because the remaining counts were merged as allied offenses of similar import.

{¶ 68} On appeal, Lucas correctly notes that there is minimal evidence in the trial record concerning the names or identities of the children listed in the indictment, or their specific movements on the day of the incident. Regardless, viewing the record in its entirety, we find the endangering children conviction pertaining to Lucas's biological child is supported by sufficient evidence. As discussed, S.L. notified the police that Lucas arrived at her apartment complex on July 24, 2022, to see their shared child. The evidence further reflects that Lucas's biological child was inside the apartment at the time Lucas discharged his firearm into a nearby wall. Lucas, as the parent of his biological child, owed the child a duty of care, protection, and support. *See State v. Primous*, 2020-Ohio-912, 152 N.E.3d 1002, ¶ 38 (8th Dist.) ("In order to be convicted of child endangering, the state must prove beyond a reasonable doubt that the defendant owed a duty of care to the child by either his relationship to [the child] or the role he undertook to assume responsibility for [the child]."). Viewed objectively, we find Lucas violated a duty of care or protection and created a substantial risk of harm to his child by recklessly discharging a firearm in the presence and proximity of the minor child. This evidence, if believed, was sufficient to support the offense of endangering children involving Lucas's biological child. *See State v. Curry*, 8th Dist. Cuyahoga No. 105203, 2018-Ohio-4771.

{¶ 69} The third assignment of error is overruled.

### D. Manifest Weight of the Evidence

{¶ 70} In the fourth assignment of error, Lucas argues his convictions are against the manifest weight of the evidence. Lucas contends that his convictions are premised on "an inept and superficial" police investigation and inadmissible out-of-court statements that were not substantiated by physical evidence, video evidence, or eyewitness testimony. Thus, Lucas asserts that "the quality of the evidence against [him] was poor and unreliable such that the trier of fact clearly lost its weigh in convicting him of all the charges."

{¶ 71} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12, citing *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541 (1997). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d

717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.* at 387, quoting *Martin* at 175.

{¶ 72} After a thorough review of the record, we reject Lucas's assertion that his convictions are against the manifest weight of the evidence due to the lack of corroborating physical evidence or eyewitness testimony. It is well-settled that a "conviction may rest solely on the testimony of a single witness, if believed, and there is no requirement that a witness' testimony be corroborated to be believed." *See, e.g., State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38; *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 43 (8th Dist.); *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 84 (4th Dist.). Similarly, this court has recognized that "a lack of physical evidence, standing alone, does not render a conviction against the manifest weight of the evidence." *State v. Abudu*, 8th Dist. Cuyahoga No. 111837, 2023-Ohio-2294, ¶ 67, citing *State v. Conner*, 10th Dist. Franklin No. 12AP-698, 2013-Ohio-2773, ¶ 12, citing *State v. Berry*, 10th Dist. Franklin No. 10AP-1187, 2011-Ohio-6452, ¶ 20.

{¶ 73} In this case, the evidence presented at trial collectively established S.L.'s appearance, demeanor, and emotional state shortly after her confrontation with Lucas on July 14, 2022. In describing the nature of Lucas's ongoing threat, S.L.'s excited utterances provided relevant details concerning Lucas's unlawful entry into her apartment, his use of physical force against her, his threats to cause future harm, and his intentional discharge of a firearm inside the apartment where his

biological child was present.  The contents of the state's exhibits were corroborated by Officer Bjekic and dispatcher DaVila, who provided relevant insights into S.L.'s statements on the day of the incident.  The decision whether, and to what extent, to believe the prosecution's evidence was "within the peculiar competence of the [trier of fact]."  *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54. Here, the trial court, having heard the testimony of the investigating officers and having reviewed the disputed exhibits, was free to believe all, part or none of the state's evidence.  *See, e.g., Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, at ¶ 85; *State v. Royal*, 8th Dist. Cuyahoga No. 93903, 2010-Ohio-5235, ¶ 21-22.

{¶ 74} Under the foregoing circumstances, we cannot say that this is an exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice such that a conviction must be reversed.

{¶ 75} The fourth assignment of error is overruled.

{¶ 76} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
ANITA LASTER MAYS, J., CONCUR